RAYNOLDS v. HANNA et al.

(Circuit Court, N. D. Ohio, E. D.    January 18, 1893.)

No. 4,743.

1. WILLS—CONSTRUCTION—DESCRIPTION OF DEVISEES AND LEGATEES.

Testator's will, by which his entire estate was devised and bequeathed to his executor in trust, provided that after the payment of taxes, repairs, insurance, and an annuity to the widow, "the remainder of the yearly income of my estate shall be divided into two equal parts, one part to be expended by my executor for the benefit of my son, Cassius, and his family, so long as he (Cassius) shall live, or, in case my executor shall deem it proper, he may pay the whole or any part of such portion of the yearly income of my estate to my son, Cassius, in cash;" that "the other of said equal parts I direct my executor to expend for the benefit of the children of my deceased daughter Arrial;" and that "in the expenditure of income for the benefit of my son, Cassius, and his family, as well as for the children of my daughter Arrial, I desire my executor to have in view the maintenance and education of my grandchildren on a scale comporting with their condition in life; and if, in the judgment of my executor, the net annual income cannot all be judiciously expended or advanced to Cassius and his family and to the children of Arrial, I direct my executor to invest such surplus as may remain for the benefit of the child or grandchildren who would be entitled to it." *Held,* that the children of Cassius were the beneficiaries intended by the term "family," and that the trust fund should be apportioned one half to Cassius and one half to his children, thus making Cassius' share one fourth of the net annual income of the estate.

2. TRUSTS—SUBJECTION OF TRUST FUND TO PAYMENT OF BENEFICIARIES' DEBTS.

The interest of Cassius in the income, impressed with the trust, whether intended for his support or his general benefit, was subject to the payment of his debts, since, where the creator of the trust does not expressly or by clearly manifest intention restrict alienation or exclude the trust property or fund from liability for debts of the beneficiary, and there is no positive provision of law to the contrary, the beneficiary may assign his equitable interest or estate, and the same may be reached and subjected to the payment of his debts by a court of equity after his creditor has exhausted his remedy at law.

3. LANDLORD AND TENANT—LEASE—RENT.

By an agreement between the executor of an estate and a coal company the executor granted the exclusive right to enter upon a mine and remove the coal in the premises, and the right to occupy and use so much of the surface of said land as would enable the company to properly conduct said mining operations, and to make use of so much of the timber on the surface of the premises as might be necessary in mining; and the company agreed to mine the coal on said premises, to take therefrom or to pay a royalty on not less than 50,000 tons of coal per year, to continue to mine and pay royalty until all the coal that can practically be mined on said premises shall be mined and paid for, to pay the executor "as royalty for the coal to be mined and taken from the premises each month the sum of 10 cents per ton," which monthly payment, at least to the amount of $416.67, shall be made regularly, whether the monthly proportion of coal on the basis of 5,000 tons per annum shall have been mined or not; to furnish a written report at the time of making monthly payments, so that the executor might be fully advised as to the "amount of coal which may have been taken from the premises under the lease, the amount paid thereon, and the place from which the same shall have been taken;" to allow the executor to inspect the books of the company relative to its operation "under the lease" for the purpose of verifying the accuracy of reports, and, if the company should fail, neglect, or refuse for 30 days

to make any monthly payment, "this lease may, at the option of the first party, be declared forfeited, and the party of the first part may at once re-enter upon and take and hold exclusive possession of the demised premises." *Held,* that the agreement was a lease, and that the monthly payment of $416.67, whether the coal was mined or not, though called a "royalty," was a rental to be paid to the executor, and as such was part of the "income" of the estate.

**4. EXECUTORS AND ADMINISTRATORS—POWERS—LEASE OF COAL LANDS.**

Where the chief, if not the sole, value of land is for coal mining purposes, and the only profit to be derived therefrom is, by sale or lease of the coal, either of which the executor, in his discretion, has power to do, the fact that the coal mines were not opened in the life of the testator does not affect the authority of the executor to lease the same, so as to make the rental thereof an income of the estate.

In Equity. Bill by F. A. Raynolds, a judgment creditor of Cassius B. Hanna, against said Hanna and others, to subject to the payment of his judgment the interest of said defendant in the estate his father, Robert Hanna, deceased. Decree for complainant.

Francis J. Wing and J. Wm. Ball, for plaintiff.
Estep, Dickey, Carr & Goff, for defendants.

JACKSON, Circuit Judge. Before taking up the exceptions of the defendant Brooks, trustee, to the master's report as amended, and filed herein May 4, 1892, it is proper to consider the question which is again strenuously urged on behalf of the respondents,— whether, under the will of Robert Hanna, deceased, the defendants Cassius B. Hanna and wife, Hattie L., or either of them, acquired any such beneficial interest or trust estate as can be reached and subjected by complainant to the payment of his judgment against them. The court has heretofore, in an opinion filed herein June 11, 1891,[1] given a construction to said will, which substantially answers this question in the affirmative, but at the request of counsel for defendants, and in the light of further argument, it has again re-examined the matter, with the result that the views already expressed and conclusions reached are rather confirmed than shaken. By the fourth item in the will the testator devised and bequeathed his entire estate to his executor, defendant Brooks, "in trust to be disposed of by him as hereinafter provided." The trustee was invested with full, ample, and complete power to manage, direct, and control the property bequeathed and devised according to his own best judgment and discretion; it being the expressed wish and purpose of the testator to invest said executor and trustee "with power to manage and control my entire estate according to his own judgment and discretion, the same as I could do myself, if living;" and "subject only to, and be restrained only by, the special limitations herein imposed and expressed by me." Now, among the special limitations imposed and expressed by the testator to which the executor's discretionary power of management and control were to be subject are certain provisions made for the benefit of the testator's

[1] The opinion referred to is superseded by the one here reported, and will not be published.

son. Cassius B., as for him and his family or children, set out in the seventh and eighth items of the original will and items 2 and 5 of the codicil, as follows:

"Item 7. I hereby authorize and direct my executor, as soon as convenient after my death, and in case my son, Cassius, shall so request, to purchase a home for him, at a cost not to exceed $12,000, taking the title to himself as executor and trustee, as aforesaid; the same to be kept as and for a home for Cassius, free of rent, so long as he desires so to occupy the same. But in the final settlement of my estate, as hereinafter provided, I direct that the money expended by my executor in insurance, taxes, and assessments on the home so occupied by Cassius, together with six per cent. interest per annum on the cost of said home for the time it shall be so occupied by him, shall be deducted from the amount that is to be paid to Cassius or his children, as is hereinafter provided, or, if my said executor shall deem it best to deduct the amount of said annual insurance, taxes, assessments, and interest from the annual income that is to be paid to Cassius or his children, as hereinafter provided, he is hereby authorized and directed to do so.

"Item 8. So far as the same is practicable in conformity with the other provisions of this will, I desire the income of my estate each year to be applied as follows: First, to the payment of taxes, insurance, assessments, and repairs that may be levied or become necessary to be made on any part of my estate, together with the necessary expenses of the administration of the same, including the compensation hereinafter provided to be paid to my executor; secondly, to the payment of the annuity of $2,000 hereinbefore provided for my wife, Harriet A. Hanna; thirdly, after the payment of all the items hereinafter mentioned, I desire the remainder of the yearly income or increase of my estate that shall be collected and received to be divided into two equal parts, one part to be expended by my said executor for the benefit of my son Cassius, and his family, so long as he, Cassius, shall live, or, in case my said executor shall deem it proper and best, but in no event otherwise, he may pay the whole or any part of such portion of the yearly net income of my estate (subject to the deductions as above provided for taxes, etc.) to my son, Cassius, in cash. The other of said equal parts into which the net yearly income of my estate is to be divided as provided in this section I direct my said executor to expend for the benefit of the children of my deceased daughter Arrial T. Whitacre, in such manner that each of said children shall have an equal and the same portion with the other. In case any of said children of my daughter Arrial should die without issue before the final division of my estate, then the share of the income of my estate of such child or children so dying shall be divided between the other children of my daughter Arrial, or the issue of them,—they, in such case, to take per stirpes, and not per capita; and in case any of the said children of my daughter Arrial should die before the final distribution of my estate, leaving issue, I direct that the share of the income of my estate which would be coming to such child of Arrial if living shall be paid to the issue of such child, share and share alike, and I hereby authorize my executor to pay in cash, if he shall deem best, the whole or any part of such share of the income of my estate as may be due to each of the children of my daughter Arrial, as aforesaid; he to take in such case the receipt of the guardian or other person who for the time being may be charged with the care or custody of said children, or either of them, for any payment made. And in the expenditure of income for the benefit of my son, Cassius, and his family, as well as for the children of my daughter Arrial, I desire my executor to have in view the maintenance and education of my grandchildren on a scale comporting with their condition and rank in life; and if, in the judgment of my said executor, the net annual income of my estate as above described cannot all be properly and judiciously expended or advanced to Cassius and his family and to the children of Arrial as hereinbefore described, I authorize and direct my executor to invest such surplus as may remain after what he deems a reasonable expenditure has been made for the benefit of the child or grandchild who would be entitled to it under the foregoing plan of distribution."

Item 2 of the codicil provides:

"In order to settle distinctly and make forever free from dispute that portion of item 8 of my said will which relates to the division and distribution of the annual net income of my estate, I hereby declare it to be my wish and will, and I do hereby accordingly direct, that the one half of said yearly net income which is to be expended for the benefit of my son, Cassius, and his family, is to be expended for his benefit only, until the time arrives when the final distribution of my estate shall be made under the provisions of said will, and to this extent are the words in said will directing said portion of income to be expended for his benefit, 'so long as he, Cassius, shall live,' to be modified and controlled; also the one half of said annual income which is to be expended for the benefit of Cassius, as aforesaid, shall, until expended or otherwise disposed of as provided in said item, be held and kept by my said executor in his possession in trust, to the end that the same may be applied as my said executor shall deem best, and not otherwise, for the benefit of my son, Cassius, and his family; also that any portion of said share of income which may be invested for the benefit of Cassius shall likewise be held and kept in his own possession, in trust by my said executor, the same to be expended for Cassius' benefit, or paid him at such times and in such amounts as he, my said executor, may deem best, and not otherwise."

By the third item of the codicil the final distribution of the estate, if not sooner made, under the powers conferred by the will is directed to be made "as soon as may be after the death of my son, Cassius, provided at that time the youngest child of my daughter Arrial then living shall have reached the age of majority;" and by the fifth item of said codicil it is declared that, "in the event of my son, Cassius, should have no children living nor grandchildren living at the time of the final distribution of my estate, as provided in my said will, I direct my executor to retain in his own custody and possession one half of the whole estate as it may then exist, and hold the same in trust so long as Cassius may live, giving to Cassius so much of the annual net income of said one half as he may deem best, and at the death of Cassius said one half of my estate so retained and held to be by said executor distributed per stirpes among the children and grandchildren of my daughter Arrial."

On the final distribution of the principal or corpus of the estate the children of Cassius then living and the children of the daughter Arrial or their issue were to share therein equally after equalizing advancements made to their respective parents by the testator. There has been no final distribution or division of the principal of the estate, and it is not material to the present case to determine when such division could or should be made by the executor, the son, Cassius, being still alive, and the youngest child of the testator's daughter not attaining his majority until September 17, 1894. While the will gives to the executor the amplest and most complete discretionary powers in the management and control of the estate, and invests him with full authority to rent, sell, or improve the whole or any part thereof, real or personal, and to invest, and from time to time reinvest, in such manner and in such property, either real or personal, as he may deem best to do, the same as the testator could do if living. Certain trusts are created and impressed upon the net annual income or incomes of the estate during the life of Cassius, or until the final distribution is made of the

principal, which confers rights and imposes duties not covered by or subject to the general powers conferred upon the executors in respect to the corpus of the estate. The testator clearly intended to separate the net income from the body of the estate, and to impress such income with a trust for the benefit of designated cestuis que trustent, and imposed upon the executor, as trustee, the duty of executing and carrying such trust into effect. Now, who are the beneficiaries of this income trust, and how far are the rights of such beneficiaries subject to the discretion of the trustee in respect to the application or disposition of the trust fund? It cannot be questioned that the three children of the testator's daughter Arrial take a vested equitable estate or interest in and to one half of said annual net income, which, under the directions of the will, the trustee was required to distribute, expend, or invest for their benefit equally. He was given the discretion to pay the whole or any part of each child's share of such income in cash, or if, in his judgment, such shares of the income could not all be properly and judiciously expended for or advanced to said beneficiaries, he was authorized and directed to invest such surplus as may remain, after what he deems a reasonable expenditure has been made, for the benefit of the child or grandchild who would be entitled to it (the surplus income) under the foregoing plan of distribution. In case any of said children should die without issue before the final division of the estate, the share of the income of such child or children so dying was to be divided between the other (surviving) children of Arrial; or if, in any event, any of such children should, before final distribution of the estate, die leaving issue, the share of such child so dying was to be paid to such issue. These limitations over in the event of the death of any of said children before the principal of the estate is divided clearly relate to their respective shares of the one half of the annual net income given to them as a class, and in no way affect the question under consideration, touching the existence and character of the trust intended to be impressed upon the income of the estate, and the duties and powers of the trustee in respect to such trusts. That it was the duty of the trustee, during the life of these grandchildren, until the final division of the principal of the estate, to pay over to, expend or invest for, them, their respective shares of said one half of the net annual income, is further shown by the ninth item of the will, which directs that the executor "shall continue to control and manage my estate, and distribute or distribute and invest the annual income of my estate, as hereinbefore provided, from year to year," until the final distribution of the estate is made. In making distribution, expenditures, or investments of said income for the benefit of the cestui que trust the testator desired the trustee to have in view the maintenance and education of his grandchildren "on a scale comporting with their condition and rank in life."

This expressed desire was manifestly not intended to cut down or restrict the trust in favor of the said grandchildren to one for maintenance and education, but was merely suggested as a consideration to be borne in mind by the trustee in making advancement

or expenditures for beneficiaries out of the trust fund, for it is followed by the imperative direction to invest such surplus of the income as may remain after all reasonable expenditures have been made for the benefit of the child or grandchild who would be entitled thereto under the testator's plan for the distribution of the income of his estate. There is no declaration, expressed or implied, that the one half of the net annual income impressed with the trust, or any part thereof, is in any event to go back to the corpus or body of the estate, and from a portion of the principal to be finally divided between the children of Cassius and Arrial after equalizing advancements previously made by the testator. It hardly admits of discussion that the children of Arrial could compel the trustee to execute this trust in their favor, and apply one half of the net annual income of the estate to their benefit. They could require him either to distribute, expend, or invest to or for them said income, according to their respective shares therein, subject to the contingent limitations over in the event of either dying before the final distribution of the estate. The neglect or refusal of the trustee either to distribute or invest the trust fund for their benefit would be a clear breach of trust. The trustee was undoubtedly invested with a discretion as to the amount in quantum of the income he would pay over in cash, or expend for the beneficiaries, and the discretion, so long as honestly and reasonably exercised, a court of equity could not or would not control; but the surplus or residue of income not so distributed was required to be invested for the benefit of the cestui que trust entitled thereto. There is nothing to indicate that it was the intention of the testator to limit and confine the application of the trust fund to the personal support of the designated beneficiaries; on the contrary, it clearly appears that the provision was for the general benefit. There is no direction or provision against anticipation or alienation by the cestui que trust of the benefit or interest given, nor is there any intention expressed or implied that the interest of the beneficiaries in the trust fund shall not be liable for or be subjected to the payment of their debts. Neither is there any limitation over in the event of bankruptcy, or upon the attempt of creditors to reach the share or interest of the cestui que trust in the funds. Under the circumstances, it is clear that the children of Arrial, when or as they come of age, could, in the absence of some prohibitory statute, have assigned or alienated their respective shares in the trust fund already accrued or which might thereafter accrue up to the final division of the principal of the estate. It is equally clear that their respective shares in the trust fund, in the absence of positive provision of law exempting such equitable interest and liability therefor, could be subjected in equity to the payment of their debts contracted after they may have attained their majority. Now, what has been said as to the one half of the net annual income bequeathed in trust for the children of the daughter of Arrial applies with equal, if not greater, force to the one half of the other half of said income given for the benefit of Cassius, or for Cassius and his family or children. The cestuis que trustent of each half of the net yearly income are placed upon sub-

stantially the same footing, with this exception: that there is no limitation over of this Cassius' half of the income in the event of his death, or of the death of either of his children, before the final division of the estate.   The trustee is directed by the eighth item of the will to expend one half of said net annual income for the benefit of Cassius and his family, or, in case he should deem it best, to pay the whole or any part thereof over to Cassius in cash; and if, in his judgment, said half of the net income could not all be properly and judiciously expended or advanced to Cassius and his family, the trustee is directed to invest the surplus thereof "for the benefit of the child or grandchild who would be entitled to it [such surplus income] under the foregoing plan of distribution."   The "foregoing plan of distribution" thus referred to related alone to the net yearly income impressed with the trusts in favor of the designated beneficiaries.   By the second item of the codicil, which was intended to settle definitely and free from dispute that portion of item 8 of the will relating to the division and distribution of the annual net income of the estate, the testator declares it to be his wish and will, and he accordingly directs, "that the one half of said net yearly income which is to be expended for the benefit of my son, Cassius, and his family, is to be expended for his benefit only until the time arrives when the final distribution of my estate shall be made, and the provisions of said will, and to this extent the words in said will directing said portion of income to be expended for his benefit, 'so long as he, Cassius, shall live,' to be modified and controlled; also that the one half of said annual income which is to be expended for the benefit of Cassius, as aforesaid, shall, until expended or, otherwise disposed of as provided in said item, be held and kept by my said executor in his possession, in trust, to the end that the same may be applied, as my said executor shall deem best, and not otherwise, for the benefit of my son, Cassius, and his family; also that any portion of said share of income which may be invested for the benefit of Cassius shall likewise be held and kept in his own possession, in trust, by my said executor, the same to be expended for Cassius' benefit, or paid to him at such time and in such amounts as he, my said executor, may deem best, and not otherwise."   It appears that no portion of said share of income has been invested by the trustee for the benefit of Cassius, but that there is a portion thereof remaining unexpended and undisposed of, which the trustee holds for the objects of the trust.

The person or persons entitled to this unexpended and uninvested surplus of the accrued income, or to such income as may hereafter accrue, until the final division of the estate, presents a question of some difficulty.   The complainant insists that Cassius is the sole beneficiary.   The respondents contend that the "family" of Cassius share equally with him in the trust fund.   If Hattie L. Hanna, the wife of Cassius, is entitled to a beneficial interest in said income trust, her share thereof would be equally liable with that of Cassius, she being equally bound by the judgment sought to be enforced.   I am, however, of the opinion after careful consideration of the matter, that the wife of Cassius takes no beneficial interest or share

in the trust, and that Cassius himself is not the sole beneficiary thereof, but that the objects of the trusts to the one half of the net income involved are Cassius and his children, of whom there are two, one a minor, and the other now an adult. The word "family," employed in the will, admits of a great variety of applications. It may mean a man's household, consisting of himself, his wife, children, and servants; it may mean his wife and children, or his children, excluding his wife; it is sometimes construed to mean his heirs at law. Its proper interpretation in each case must depend upon and be determined by the context of the will, the circumstances in which the testator is placed, and the character and situation of those who may be presumed to be the objects of his bounty. Story, Eq. Jur. §§ 1065b, 1071, and cases cited.

In Pigg v. Clarke, 3 Ch. Div. 672, it was said by the master of the rolls that "every word which has more than one meaning has a primary meaning; and if it has a primary meaning you want a context to find another. What, then, is the primary meaning of 'family?' It is 'children.' That is clear upon the authorities which have been cited, and, independently of them, I should have come to the same conclusion."

In the present case it may be assumed that Cassius and his children were, equally with the children of the deceased daughter Arrial, the objects of the testator's bounty. The provisions of the ninth item of the will and fifth item of the codicil indicate that the children of Cassius were the beneficiaries intended by the term "family," rather than the wife and children. They come within the expressed desire of the testator that the trustee, in the expenditure of the trust fund, should have in view the maintenance and education of the grandchildren on a scale comporting with their their condition and rank in life. Cassius' children are so far implied, if not express, objects of the testator's bounty, that, if the entire trust fund were paid over or received by him, a court of equity would treat and consider him a subtrustee for their benefit to the extent of a fair proportion of the fund, under the principle laid down in Chase v. Chase, 2 Allen, 101; Perry, Trusts, §§ 117, 118, and cases cited. The children of Cassius being cobeneficiaries with him of the trust fund, it is claimed that there can be no apportionment thereof, so as to give him or his creditors any definite or separate portion thereof. It is, however, well settled that a court of equity can, and will in cases like the present, apportion the trust fund. Perry, Trusts, § 118; Nichols v. Eaton, 91 U. S. 723, and cases cited.

How the trust fund in question should be divided between Cassius and his children is a matter not free from doubt or difficulty, but, taking an equitable view of it, the apportionment should be made between them so as to assign or allot one half thereof to Cassius and one half to his children; thus making Cassius' share from the net yearly income of the estate one fourth of the whole.

It is further urged that the trust fund here under consideration is to go for the support of the designated beneficiaries, and that Cassius' interest therein cannot be subjected to the payment of his

debts. There is nothing on the face of the will to sustain the assumption that the income impressed with the trust was intended for support, rather than for the general benefit of the cestui que trust. But suppose it was bequeathed for that purpose, or for that object, would that defeat the right of the beneficiary to alienate his interest, or prevent his creditors from reaching it, in the absence of some positive provision of law exempting it from such liability, or of a clearly expressed intention on the part of the creator of the trust that the fund should not be assigned or be made liable for the debts of the cestui que trust? We think not. The general doctrine on the subject is thus stated by Perry, Trusts, § 386:

"Therefore, when an equitable interest is mentioned in the cestui que trust, he may dispose of it, or it may pass to his assignee by operation of law, if he become a bankrupt. Thus a trust for a person's support, or to pay the interest to a person for life, as the trustee may think proper, or when it shall become payable, or in such sums or portions, and at such times and in such manner as the trustee may think best, may be exercised according to the direction of the trustees, but the bankruptcy of the cestui que trusts puts an end to the discretion of the trustees, and vests the whole interest in the assignees; and this is so where the trustees were directed to pay as they should think proper, and at their will and pleasure, and not otherwise, so that the cestui que trust should have no right, claim, or demand other than the trustees should think proper."

The court thought in Snowdon v. Dales, 6 Sim. 524, that, taking the whole instrument together, the cestui que trust has a vested interest; that those directions applied only to the manner of enjoyment, and that the equitable interest vested in the assignee at his bankruptcy. The test is: Would executors of the cestui que trust have a right to call for any arrears? If so, the assignees would have the right to call for the future income or interest. This is directly applicable to the present case. There is a further consideration and distinction on this subject pointed out by the court in Slattery v. Wason, 151 Mass. 266, 23 N. E. Rep. 843, where it is said:

"When the whole income or a definite sum is given the beneficiary for his support, the whole belongs to him, and is to be applied by him at his discretion, and the expression of the purpose for which it is given is not deemed to be the expression of an intention that the right to secure it shall not be inalienable; but when the right given is for the support out of a fund which is given to another, the right is in its nature inalienable, and the intention of the donor that it shall not be alienable is presumed."

What is meant by this latter clause is that when a fund is given, not to a trustee, but to any person beneficially, and is charged with the support of another, the latter's interest is presumably inalienable. Thus in Baker v. Brown, 146 Mass. 369, 15 N. E. Rep. 783, the testatrix gave her estate to daughters, "subject to the condition that they should support their father during his lifetime." It was held that under the circumstances of that case the intention of the testatrix was that the daughters should furnish the father with a reasonable support in their own household or elsewhere, the mode of his support being in their discretion, and that the interest of the father was such that it could not be reached by his creditors

without imposing upon the daughters duties and obligations different from and greater than those imposed by the will.

The general doctrine laid down in Perry, Trusts, §§ 286, 286a, and in 2 Story, Eq. Jur. §§ 974, 974a, following the English rule announced in Brandon v. Robinson, 18 Ves. 429, that alienability and the consequent liability for debts is an inseparable incident attaching to any vested beneficial interest or trust estate in the absence of limitations over, or for other provisions for the lessor of such interest in such event, has no doubt been qualified or departed from by many courts in this country to the extent of holding that a party may settle property on another or for another's benefit in such a manner that it cannot be alienated or passed to assignees so as to be reached by creditors, even when there is no provision that the interest shall cease and determine upon the happening of such contingency, nor any limitation over. Thus it is said in Sparhawk v. Cloon, 125 Mass. 263, that—

"The rule in England, since the time of Lord Eldon, has provided that when income of a trust estate is given to any person (other than a married woman) for life, the equitable estate for life is alienable by, and liable in equity to, the debts of the cestui que trust, and that this quality is so inseparable from the estate that no provision, however expressed, which does not operate as to lessor or limitation of the estate or interest itself, can protect it from his debts, [citing Brandon v. Robinson, 18 Ves. 429; Bramhall v. Ferris, 14 N. Y. 41–44; and Nichols v. Levy, 5 Wall. 433.] On the other hand, it has been maintained by the courts of recognized authority that the founder of a trust may secure the enjoyment of it to other persons, the object of his bounty, by providing that it shall not be alienable by them, or to subject it to be taken by this condition; and that his intention in this regard, when clearly expressed by him, must be carried out by the court, even though there is no cessor or limitation over."

In Bank v. Adams, 133 Mass. 170, it was held that a person having the entire right to dispose of property may settle it in trust in favor of another with the provision that the income shall not be alienated by the beneficiary by anticipation, or be subject to be taken by his creditors in advance of its payment to him, although there is no cessor or limitation over the fund or estate in such an event. In Foster v. Foster, 133 Mass. 179, 180, the will provided that "the trustees may, at their discretion, pay or apply the income of the fund to the personal benefit or comfort of the son, or such member or members of his immediate family as the trustees may think proper, and that such income shall not be subject to his [the son's] debts, or assignable by him by way of anticipation;" and it was held that the son had no such interest as could be reached by his creditors. That case is too clearly distinguishable from the present to require further notice. It certainly does not sustain the contention that the share of Cassius of the trust fund under consideration cannot be reached by complainant. Maynard v. Cleaves, 149 Mass. 307, 21 N. E. Rep. 376, more nearly approaches the present. There the testator gave to his wife, during her life, the income of all his estate, "to be for her comfort and support," and expressing the wish that she should provide for an unmarried daughter, and that a "home and grounds" be kept "as a home for them." After the death of the daughter, creditors of the beneficiary were allowed

to subject the income to the payment of their debts against her, the court saying:

"It is settled in this commonwealth that a testator who makes a gift of income to a beneficiary may provide that it shall not be alienable in advance by him, or be subject to be taken by his creditors. But, in order to give such a qualified estate, instead of an absolute one, the language of the testator must be such as clearly to import an intention to do so. In the case at bar the testator makes an absolute gift of the whole income of his estate to his widow for her life. The words, 'to be for her comfort and support,' at most express the motive and purpose of the gift, but cannot be held to make the gift conditional. They have little, if any, more significance than the words, 'to be for her benefit and enjoyment,' and are not to cut down the clearly expressed absolute gift to a qualified or conditional one."

The courts of Vermont, Connecticut, Pennsylvania, Maryland, Virginia, and of Missouri hold substantially the same doctrine as that announced in the above Massachusetts decision, and the supreme court, in Nichols v. Eaton, 91 U. S. 716–730, has indicated an inclination to adopt this modern view and departure from the English rule; but neither in that case nor in any other that has come to our attention has the supreme court actually done so. The positive authority of Nichols v. Eaton is coextensive only with the facts on which it was made. It has, however, been frequently misapplied, or pressed beyond what was actually decided. In that case the will contained the express provision that, if the beneficiary should alienate or dispose of the income to which he was entitled under the trusts of the will, or if by reason of bankruptcy or insolvency or any other means whatsoever said income could be no longer personally enjoyed by him, but the same would become vested in or payable to some other person, then the trust expressed in the will, concerning so much thereof as would so vest, should immediately cease and determine, and the trust fund was then to be paid to the wife and children, or wife and child, as the case might be, of the beneficiary, and, in default of any wife, child, or children, the income was to accumulate in augmentation of the principal fund; thus making a clear limitation over upon the happening of the designated contingencies which were to determine the benficiary's interest.

It was further provided that, in case, after the cessation or determination of the beneficiary's interest in the income as directed, the trustees might, "in their discretion, but without its being obligatory upon them, pay to or apply for the use of" the beneficiary, or for the use of him and his wife and family, so much and such parts of the income to which the said beneficiary would have been entitled under the preceding trusts, in case the forfeiture provided for had not happened. The trust under the will terminated by bankruptcy of the beneficiary. The assignee thereafter claimed the fund, or a portion of it, under the discretionary power conferred upon the trustees to pay or to apply the income for the use of the cestui que trust, or for him and his wife and family, to the same extent the beneficiary would have been entitled if the forfeiture had not happened. It was conceded by the claimant, and so held by the court, that the beneficiary's interest given by the

will had ceased and determined on his bankruptcy, and it was further held by the court that it was thereafter purely discretionary with the trustees whether they would pay to or apply any parts of the forfeited income to the use of the beneficiary, or for him and his family, and that this discretionary power in the trustees could not be controlled by the court, or be called into exercise either for the former cestui que trust or his creditors. Whatever might come to the beneficiary from the voluntary exercise by the trustees of the discretion conferred upon them would neither constitute a portion of the trust bequest, nor be subject to the control or claims of the assignee. This case of Nichols v. Eaton closely resembles that of Godden v. Crowhurst, 10 Sim. 642–644, where the will directed that, in case the testator's son, for whom the trust was created, "should at any time or times make any assignment, mortgage, or charge of or upon, or in any manner dispose of by way of anticipation the said interest, dividends, or accumulations, or any part thereof, to which he was entitled for life, as aforesaid, or attempt or agree so to do, or commit any act whereby the same, or any part thereof, could or might, if the absolute property thereof were vested in him, be forfeited unto or become vested in any person or persons, then, and in any of said cases, his trustees shall henceforth pay and apply the said interest, dividends, and accumulations for the maintenance and support of his said son, and any wife, child, or children he might have, and for the education of such issue, or any of them, as his trustees for the time being should, in their discretion, think fit." There, as in Nichols v. Eaton, the beneficial interest given by the will terminates upon the happening of one of the contingencies expressly provided for; and thereafter the application of the fund rested in the discretion of the trustees. Neither of these decisions, cited and relied on by respondents, are in point here. The case under consideration is essentially different. Here there is no intention, expressed or implied, that the share of the trust fund given to Cassius was to terminate or be forfeited in any event, or for any cause. Nor was there any prohibition against alienation or anticipation, but his interest was to continue without restriction as to its use during his life, or until the final division of the corpus of the estate. Neither was it left to the discretion of the trustee to give or withhold this interest from the designated beneficiary; on the contrary, it was made his imperative duty to pay over or expend or invest that share of the fund for the benefit of the cestui que trust. Such discretion as was not conferred upon the trustee relates alone to the quantum of the fund he would pay in cash, or to the manner of its expenditure for the beneficiary, or to the investment of any surplus of the fund for the benefit of Cassius. The trust was an executed one, and such discretion as was given the trustee was subject to control, and neither prevented the interest intended for Cassius from vesting, nor in any way affected his beneficial ownership. If, therefore, the more modern rule adopted in some of the states in reference to trust interests or estates were applicable to the case at bar, it would not follow that the share of Cassius in

the trust fund here involved could not be reached by his judgment creditor. Some of the authorities relied on by respondents, such as Leavitt v. Beirne, 21 Conn. 1, were settlements for married women and for wives and children, which stand upon a different footing; the rule in respect to trusts for married women being that during coverture restrictions or provisions against alienation or anticipation are valid, but terminate or cease to be operative upon or after discoverture. Perry, Trusts, §§ 387, 671. This class of cases has no application to trusts in favor of persons sui juris, like the present.

In some of the states, as in New York, Illinois, and Tennessee, there are statutory provisions preventing the alienation of trust estates, or exempting the interests of the beneficiaries therein from liability for the debts where the trust is created by, or the property so held has proceeded from, some person other than the defendant himself, and the trust is declared by will duly recorded or deed duly registered. Graff v. Bonnett, 31 N. Y. 9; Campbell v. Foster, 35 N. Y. 361; Williams v. Thorn, 70 N. Y. 270; Nichols v. Levy, 5 Wall. 433; Spindle v. Shreve, 111 U. S. 542-548, 4 Sup. Ct. Rep. 522; and one branch of Potter v. Couch, 141 U. S. 319, 320, 11 Sup. Ct. Rep. 1005,—were cases where such statutory provisions were construed and applied. In Spindle v. Shreve, 111 U. S., at pages 547, 548, 4 Sup. Ct. Rep., at pages 524, 525, it is said by Mr. Justice Matthews, speaking for the court—

"That it cannot be doubted that it is competent for testators and grantors, by will or deed, to establish trusts, both of real and personal property, and of rents, issues, and profits, and produce of the same, by appropriation and limitation and power to trustees, which shall secure the application of such bounty to the personal and family uses during the life of the beneficiary, so that it shall not be subject to alienation, either by voluntary act on his part or in invitum by his creditors. The limits within which such provision may be made and administered of course must be found in the law of that jurisdiction which is the situs of the property in case of real estate, and in case of personalty where the trust was created, or is to be administered, according to circumstances; and in determining these limits that law declares how far and by what forms and modes the institution of property may be permitted to accommodate itself to the will and convenience of individuals, without prejudice to public interests and policy; by what limitations and instruments its usual incidents may be affected and altered. so as to effectuate the intention of parties; how far the dominion implied in the idea of property may be extended, so as to limit the future dominion of those who succeed to the beneficial enjoyment. It follows that the judgment in each case must be determined by the positive provision of the law of the localities which govern it, and the particular terms of the instrument by which the scheme is framed."

The result of the authorities most favorable to the contention of respondents is that, where the creator of the trust does not expressly or by clearly manifested intention restrict alienation or exclude the trust property or fund from liability for debts of the beneficiary, and there is no positive provision of law to the contrary, the cestui que trust may assign his equitable interest or estate, and the same may be reached and subjected to the payment of his debts by a court of equity, after his creditor has exhausted his remedy at law. "It is the settled rule of law," says Mr. Justice Swayne,

speaking for the court, in Nichols v. Levy, 5 Wall. 441, "that the beneficial interest of the cestui que trust, whatever it may be, is liable for the payment of his debts. It cannot be so fenced about by inhibitions and restrictions as to secure to it the inconsistent characteristic right and enjoyment to the beneficiary and immunity from his creditors."

There is no statute of Ohio establishing a rule of property in respect to trust estates that exempts the interests of the beneficiary therein from liability for his debts; on the contrary, it is provided by section 5464, Rev. St. Ohio, that "when a judgment debtor has not personal or real property subject to levy or execution sufficient to satisfy the judgment, any equitable interest which he has in real estate, as mortgagor, mortgagee, or otherwise, or any interest he may have in any banking, turnpike, bridge, or other joint-stock company, or in any money contract, claim, or chose in action due or to become due to him, or in any judgment or order, or any money, goods, or effects which he has in the possession of any person or body politic or corporate, shall be subject to the payment of the judgment by action." It hardly admits of debate that the interest or share of Cassius in the trust fund held by and in the possession of the defendant Brooks, falls within the comprehensive provisions of this statute; and we have been cited to no decision or decisions of the supreme court of Ohio holding that such an interest as that given to and possessed by Cassius B. Hanna in the trust fund under consideration could not be reached by his creditors. Under the general rule stated by Mr. Justice Matthews in Spindle v. Shreve, 111 U. S. 547, 548, 4 Sup. Ct. Rep. 524, 525, quoted above, testators in Ohio cannot so execute wills or create trusts that a compliance therewith will result in a violation of law, or in overriding the provisions of the statute making the interest of the beneficiary in a trust fund liable for his debts, unless there is some forfeiture clause or limitation over which will operate to terminate the interest of the estate of the cestui que trust. It may well be doubted whether, under a statute like that of Ohio, an expressed intention or declaration of the testator that the share of Cassius in the trust fund should not be subjected to his debts, in the absence of any limitation over or termination of his interest, could have been sustained. It is not a sound proposition to say that the intention of the testator in such a case must be executed without regard to the existing law, or that his expressed wishes shall prevail against the positive provisions of the statute in respect to interests or estates given. In Kentucky there is a statute substantially like that of Ohio, and the decisions in that state fully sustain the views above expressed. Thus in Marshall's Trustee v. Rash, 87 Ky. 116, 7 S. W. Rep. 879, the interest of the cestui que trust was given to him absolutely, but with discretion in the trustees in whom the control or title was vested to pay to him such portions of the profits and in such manner as he might think best. It was held that this discretion the trustee was bound to exercise in good faith, and the reasonable exercise of which a court of equity would compel for the benefit of the beneficiaries, and that the interest of the cestui

que trust could be reached and subjected to the payment of his debts, and it was so subjected notwithstanding the discretion conferred upon the trustees. In Bland's Adm'r v. Bland, (Ky.) 14 S. W. Rep. 423, there was a trust fund created, the income of which the will directed to be paid annually to a certain person for life, and declared that such income should not be subject to the debts of the beneficiary, and that, if any attempt was made to subject it to such debts, it should be added to the principal, and the beneficiary should receive no part of it. These provisions of the will were held not to take such income out of the operation of a statute making trust estates subject to the debts of those for whose use they are held. In the more recent case of Bull v. Bank, Id. 425, the same general principle was announced and applied where the devisor of the rents and profits of an estate provided that the interest should not be subject to the claim of any creditor.

Without multiplying authorities on this subject, which is fully discussed in those already referred to, and in 2 Pom. Eq. Jur. § 536, the conclusion of the court is that Cassius B. Hanna's share of the net annual income of the estate, accrued and to hereafter accrue until the final distribution of the principal thereof, as provided by the will, can be reached and subjected in this proceeding to the payment of complainant's judgment. The question on which the court entertains the most doubt is whether said Cassius is not entitled to the entire one half of said net income, instead of the share as above indicated, and apportioned to him, but this doubt the court has resolved against the complainant and in favor of Cassius' children on the presumption that the latter were together, equally with the son, the objects of the testator's bounty.

In regard to what should be treated or regarded as the net yearly income of the estate, which is made the subject of the trust by the will, the chief, if not the only, question or matter of difference or dispute between the parties is whether certain funds or monthly payments received and to be received by the executor and trustee from the Hocking Coal & Iron Company, under a written contract made and entered into between him and said company on September 9, 1885, for the mining of coal on certain land of the testator located in Hocking county, Ohio, are to be considered income or part of the corpus of the estate. The master has reported that the money received under this contract (amounting, up to March 31, 1892, to the sum of $30,000) was "income" of the estate, within the terms of the trust. To this the respondents have excepted, claiming that the fund is part of the "corpus" of the estate. The executor and trustee has so treated it, and made no distribution or investment thereof, for the beneficiaries entitled to the net income under the trust. Whether said fund is to be regarded as "income" or "corpus" of the estate depends mainly upon the question whether the contract under which it has been and is still being received is a lease of the coal mine or a sale of the coal as part of the realty. This must be determined by the proper construction of the instrument and the intention of the parties. By the terms of the contract called an "agreement" the executor "grants" to the Hocking

Coal & Iron Company "the exclusive right, license, and permission to enter upon the mine and remove the coal" from the premises. He also "grants" to said company "the right to occupy and make use of so much of the surface of said land as will enable the second party (said company) to efficiently and properly conduct said mining operations, also the right to make use of so much of the timber on the surface of said premises as may be necessary in mining on said premises; in consideration whereof the company agrees to mine the coal on said premises, and to take therefrom, or to pay royalty on, not less than 50,000 tons of coal in each and every 12-months period from and after the 1st day of September, 1885, and so continue to mine and pay royalty until all the coal that can be practically mined on said premises shall be so mined and paid for: provided, that, if the second party shall not find it practicable to remove more than 25,000 tons of coal during the first period of 12 months under this lease, the remaining 25,000 tons due for said period shall be mined or paid for in addition to the stipulated 50,000 tons in the year following." The company further agree to conduct such mining operation in a good and workmanlike manner, and especially in such manner that all the coal that can be practically mined on said premises shall be so mined and paid for. And the company also agrees, within three months, to furnish the executor a map and specifications of the plan on which it proposes to conduct the mining operations; also the size and location of pillars which it proposes to leave in order to keep said mine in a perfectly good condition until the coal, as aforesaid, shall be removed from the premises. Such plans and specifications were to be deemed part of the contract, and receive the approval of the executor before the contract was to have any force whatever. The second party further agrees to pay the executor, as royalty for the coal land to be mined and taken from the premises as aforesaid in each month, the sum of ten (10) cents per ton of two thousand pounds for lump coal, such as usually passes over an inch and a quarter screen. Said payment to be made on or before the 20th day of the month following the month in which such coal shall have been mined. It is the intention of the parties that said monthly payment under this contract, at least to the amount of $416.17 each, shall be made regularly, whether the monthly proportion of coal on the basis of 50,000 tons per annum shall have been mined or not, and that any payment so made in advance of coal actually mined shall be applied as royalty on the coal which may be thereafter mined in excess of the minimum amount herein provided for; also, that said second party shall be deemed to have fulfilled its covenant in respect to payment of royalty during the first two years of this lease if it shall pay monthly on the basis of 25,000 tons per year for the first of said twelve-months period, and on the basis of 75,000 tons per year for the second of said twelve-months period."

At the time of making the monthly payments the company agreed to furnish a written report by its engineer or other proper officer, showing the number of tons of coal mined during the preceding

month, also the total number of tons mined to date of said report, also a description of the location in the mine from which the coal mined in the month preceding was taken, to the end that the executor might be fully advised as to "the amount of coal which may have been taken from said premises under this lease, the amount paid thereon, and the place from which the same shall have been taken." The right was reserved to the executor, either in person, or by his representative to enter upon the premises, or any part thereof, at reasonable hours, for the purpose of inspecting the work of mining the coal, etc., and verifying, by measurement or otherwise, the amount of coal that has been taken from the land. The right is also given the executor to inspect the books and papers of the company relating to its operations "under this lease" for the purpose of verifying the accuracy of said reports. The company was to pay taxes, fees, and expenses under state or national laws on the coal mine, while the executor was to pay taxes on the land and coal which was not mined. It was further provided that if the coal company should "fail, neglect, or refuse, for thirty days after the same became due, to make any monthly payments, this lease may, at the option of the first party, and not otherwise, be declared forfeited, and in the event of such forfeiture the first party may at once re-enter upon, and take and hold exclusive possession of, the demised premises, and every part thereof." The executor was also given the right to forfeit the contract for the company's failure or neglect to perform either or any of its covenants, and was given a lien, in case of any such default, upon all the improvements, tracks, and fixtures which the company may have constructed or placed upon or under the surface of the premises granted, as security for full performance of each and every covenant stipulated to be paid or performed. If the mining operations of the coal were interrupted by strikes, or through means or agencies beyond its control, the obligation to mine and pay said royalty should be suspended during the period of such interruption, but except during the period of such unavoidable interruption the company was to be liable for "the amount of royalty which would be due under the terms of this contract, in respect to coal mined each month, the same as if said coal had actually been mined." It was further agreed that the company should "make no sale, transfer, or assignment, in any form, of its rights under this agreement, nor sublet any portion of said premises hereby demised," without the written consent of the executors, "and any such sale, transfer, assignment, or subletting without the consent of the first party, in writing, shall be null and void." When the company has mined and paid for all the coal that could practically be mined, and fully performed all its covenants, it was permitted to remove from the premises all tracks, fixtures, and other properties which it may have placed thereon.

This contract or agreement is clearly, in its legal effect and meaning, a lease, and the monthly payment of $416.67 whether coal is mined or not, although called "royalty," is the rental to be paid by the lessee for "the exclusive right, permission, and license to enter upon the mine, and remove the coal," together with "the right to oc-

cupy and make use of so much of the surface of said land as will enable the second party to efficiently and properly conduct said mining operations, and to make use of so much of the timber on the surface of the premises as may be necessary in mining." That the executor "grant" these rights in no way changes the character of the agreement, which is five times referred to as a "lease." No technical words are necessary in a lease, and it is not material that the rental to be paid to the lessee is called "royalty," which is perhaps the most appropriate word where rental is based upon the quantity of coal or other mineral that is or may be taken from the mine. The subject of the contract is frequently referred to in the instrument as the "demised premises." The stipulations against subletting without the written consent of the executor, and for forfeiture and a re-entry for the nonpayment of the monthly royalty or rent, or for nonperformance of either or all of the covenants on the part of the company, are more appropriate to a lease than to an absolute sale of the coal in place, or as mined. "The legal understanding of a lease for years is a contract for the possession and profits of land for a determinate period, with the recompense of rent." U. S. v. Gratiot, 14 Pet. 538. In that case the license for smelting ore was styled an "indenture," and the compensation to be paid was 6 pounds of every 100 pounds of lead smelted. It was held to be a lease. In the present case the term is sufficiently definite. Subject to its sooner termination under the forfeiture clauses of the contract, it is to continue so long as there is coal that can be "practicably mined." This constitutes a "determinate period." The parties themselves contemplated a lease, and so regarded the contract. The resolution of the Hocking Coal & Iron Company's board of directors authorized and directed its president to execute, in the name and under the seal of the company, "an agreement of lease" between itself and the defendant Brooks, executor and trustee, of the coal in the described premises; and said Brooks, in his testimony attached to the amended and supplemental report, (page 15,) speaks of the contract as a lease. The contract in Hyatt v. Bank, 113 U. S. 408, 5 Sup. Ct. Rep. 573, was treated as a lease, although it purported to "convey" all the minerals, coal, iron ore, etc., upon and under the land, for which fixed royalties were to be paid for the articles mined and removed. The case of Edwards v. McClurg, 39 Ohio St. 41-48, cited and relied on by defendants, is clearly distinguishable from the present, and does not support their contention that the contract here involved is a sale of coal, rather than a lease of the mining rights. But, aside from all this, the money received under the contract, whether called "royalty" or "rent," is clearly "income or increase" of the estate collected by the executors. The company has not yet mined a ton of coal under this contract, but it has been making the stipulated monthly payment of the $416.67 since September 1, 1885. Whether the company will ever exercise its right or license to mine coal rests upon its own volition. Should it fail or decline to mine coal, or for any cause forfeit the right to do so, the money received by the executor could not possibly be considered a part of the realty or "corpus" of the estate, rather than

"income." Again, the contract provides that the "company shall be deemed to have fulfilled its covenant in respect to the payment of royalty during the first two years of this lease if it shall pay monthly on the basis of 25,000 tons per year for the first of said twelve-months period, and on the basis of 75,000 tons per year for the second of said twelve-months period." But, subject to that exception or special provision for the first two years, the contract declares that "it is the intention of the parties that said monthly payments, at least to the amount of $416.67 each, shall be made regularly, whether the monthly proportion of coal on the basis of 50,000 tons per annum shall have been mined or not, and that any payment so made in advance of coal actually mined shall be applied as royalty on the coal which may be thereafter mined, in excess of the minimum herein provided for." No coal having been mined, the company, in order to get any benefit of the payments already made, must in the future mine coal in excess of 50,000 tons per annum.

How can the right or license to mine coal in excess of the minimum of 50,000 tons per annum, taken in connection with the uncertainty whether it will ever be exercised or not, operate or have the effect to convert or change funds that are now clearly income into "corpus" of the estate? The intention of the testator was to give the designated beneficiaries of the trust the net "income or increase" of his estate that should be collected or received by the executor under powers of management and control as broad as those possessed by himself, if living. In Eley's Appeal, 103 Pa. St. 396, when the word "income" was used in a will creating a trust, the court said:

"In seeking for the testator's intention, we derive little or no assistance from that class of cases in which it has been properly held that a lease of the exclusive right to mine and remove coal or other mineral, without limitation as to the quantity or time, is practically a sale of coal or other mineral in place of the land itself. The word 'income' means the gain or profit which accrues from the property, labor, or business. In its ordinary and popular meaning, it is strictly applicable to the periodical payments in the nature of rent, which are usually made under coal and other mineral leases, and we have no doubt it was so used by the testator. In the absence of any provision, expressed or implied, that the payments in the nature of rents shall be accumulated for the ultimate benefit of those in remainder, it would be a strained and unnatural construction to hold that he intended to give appellants only the annual interest in the installments of rent."

The further contention urged by respondents, that, inasmuch as coal mines in question were not opened in the life of the testator, the executor had no authority to lease the same so as to make the rental therefor income, is not sound. In Eley's Appeal, supra, it is held that "by empowering his executors, with the written consent of six tenths of the owners, to lease the coal for mining purposes, the testator virtually gave appellants the same right they would have had if the mines had been open and operated in his lifetime." Daly v. Beckett, 24 Beav. 114-123, supports this proposition, and is an authority directly in point. In the present case the executor was invested with the same power of leasing as the testator himself possessed, and that, too, without the consent of any one interested, directly or remotely, in the estate under the will. This

manifestly placed the executor's authority to make the contract in question upon the same footing as though the mines had been opened by the testator in his lifetime. It is settled law that the rents of an open mine are income, and go to the tenant for life; and in Wentz's Appeal, 106 Pa. St. 301, and McClintock v. Dana, 106 Pa. St. 386, it was decided that when land is chiefly valuable for coal-mining purposes, although the mines are unopened, the power to lease the real estate included the power to lease the coal lying under the surface. So in Williard v. Williard, 56 Pa. St. 119, it is held that a life tenant of land, whereof the timber is the chief or intended source of profit, may cut it for profit. In the present case it appears that the chief, if not the sole, value of the land, was for coal-mining purposes, and that the only profit to be derived therefrom was by sale or lease of the coal, either of which the executor, in his discretion, had the power to do. Having exercised the discretionary power of leasing, the rents or royalties in his hands, derived from the lease of the coal mines, are to be regarded as income, within the meaning of the testator's will. See Bedford's Appeal, (Pa.) 17 Atl. Rep. 538.

It follows that the exception taken by defendant or defendants to the report of the master as to the character of funds received by the executor under said contract of September 9, 1885, with the Hocking Coal & Iron Company, must be disallowed and overruled, and that the money already and yet to be received thereunder should be regarded as income, in which the defendant Cassius B. Hanna has a one-fourth share, which is subject to the payment of complainant's debts. The $30,000 of rent or royalty received by the executor up to March 31, 1892, has been commingled with other funds, and invested by him, and he states that there has been no loss on said investments. The master reports (amended and supplemental report) that, exclusive of said royalties for lease of coal mines, the trustee has received between November 20, 1889, and March 31, 1892, net income to the amount of $17,008.67. It is suggested by counsel for defendant that the master's addition is wrong, and that this should be only $16,518.67. But the court finds no such error in the addition as claimed. The complainant is entitled to subject in the hands of the trustee one fourth of said sum of $17,008.67 to the payment of his judgment against Cassius B. Hanna. The trustee will be allowed no credit for sums paid or advanced to Cassius B. Hanna and his wife, Hattie L. Hanna, from and after the 4th day of December, 1889, when said trustee was served with process in the cause, and had notice of complainant's claim, and all payments and advances made by the trustee after that date were made at his own risk and peril, including the $1,876.50 paid Mrs. Ford on December 28, 1889, for account of Cassius B.

It is shown by the report that the income account of Cassius B. Hanna prior to November 20, 1889, had been overdrawn to the amount of $690.95. This sum will be deducted from the above allowance made complainant, as against said Cassius and the said trustee. It is not material to determine and fix what is the exact

amount of the present net annual income of the estate, either including or excluding the rent or royalty upon coal mines. There will, however, be inserted a provision in the decree that one fourth of the net annual income of the estate, including the rent and royalty from the lease of coal land, and from all other sources, that may have been received since March 31, 1892, and that shall thereafter and hereafter be collected and received by the trustee, shall, as received and collected, be paid over to complainant or his attorney of record on and towards the satisfaction of the complainant's judgment, and interest thereon, until it is discharged, or until the final division of the estate among the testator's grandchildren, as provided by the will.

The foregoing conclusions render it unnecessary to consider and separately act upon the various exceptions to the master's report or reports, filed by the parties. Said exceptions so filed, so far as not disposed of above, are overruled. The costs of the cause, including a reasonable allowance to the special master, will be divided between the complainant and the defendant Brooks, each being taxed with one half thereof. Let a decree be entered accordingly.