PARKER, Superintendent for Five Civilized Tribes, et al. v. RILEY et al.

(Circuit Court of Appeals, Eighth Circuit. May 14, 1917.)

No. 4520.

1. INDIANS ⬥⟶16(3)—LANDS—LEASES—APPROVAL BY SECRETARY OF INTERIOR.
   Act May 27, 1908, c. 199, § 1, 35 Stat. 312, provides that homesteads of allottees enrolled as mixed-blood Indians having half or more than half Indian blood, and all allotted lands of enrolled full-bloods and mixed-bloods of three-fourths or more Indian blood shall not be subject to alienation prior to April 26, 1931, except that the Secretary of the Interior may remove such restrictions wholly or in part. Section 2 authorizes leases of restricted lands for oil, gas, or other mining purposes with the approval of the Secretary of the Interior. Section 9 provides that, if any member of the Five Civilized Tribes shall die leaving issue born since March 4, 1906, the homestead of the allottee shall remain inalienable for the use and support of such issue during their lives until April 26, 1931, unless restrictions against alienation are removed by the Secretary of Interior in the manner provided in section 1. *Held* that, where an allottee died leaving a child born since March 4, 1906, and other heirs, the subsequent approval by the Secretary of the Interior of an oil and gas lease by the heirs removed the restrictions on alienation from the leasehold and the royalties thereunder, without a removal of the restrictions or alienation being first procured under section 1.

   [Ed. Note.—For other cases, see Indians, Cent. Dig. § 45.]

2. INDIANS ⬥⟶16(3)—LANDS—LEASES—APPROVAL BY SECRETARY OF INTERIOR.
   Such lease was an alienation of the oil and gas taken from the land by the lessor, and the approval thereof by the Secretary of the Interior was a removal of restrictions on such alienation.

   [Ed. Note.—For other cases, see Indians, Cent. Dig. § 45.]

3. INDIANS ⬥⟶18—LANDS—DESCENT—RIGHTS OF PARTIES.
   Assuming that the child born after March 4, 1906, has an estate for life in the allotment, and that this estate was not terminated or changed by the lease, the royalties nevertheless belonged to the heirs in equal shares, to whom the land descended under the Laws of Oklahoma, since as owner of an estate for life she had no right to open any mines, and no right by virtue of her life estate to the royalties or rents and profits from mines subsequently opened.

   [Ed. Note.—For other cases, see Indians, Cent. Dig. § 49.]

4. INDIANS ⬥⟶18—LANDS—DESCENT—RIGHTS OF PARTIES.
   The child born subsequently to March 4, 1906, did not have an estate for life in the allotment, but at most only an estate for years, defeasible during its term by her death, or by the removal of the restrictions on alienation by the Secretary of the Interior.

   [Ed. Note.—For other cases, see Indians, Cent. Dig. § 49.]

5. CONSTITUTIONAL LAW ⬥⟶93(1)—INDIANS ⬥⟶15(1)—LANDS—RESTRICTIONS ON ALIENATION—VESTED RIGHTS.
   Section 7 of the Original Creek Agreement (Act March 1, 1901, c. 676, 31 Stat. 861) and section 16 of the Supplemental Creek Agreement (Act June 30, 1902, c. 1323, 32 Stat. 500) provided that the homestead of Indian allottees should be inalienable for 21 years, and remain after the death of the allottee for the use and support of children born after the date of the ratification of the original agreement. *Held*, that Act May 27, 1908, so far as its provisions are repugnant to and inconsistent with the original

and Supplemental Agreements, repeals them, and is a substitute therefor, and such repeal did not deprive the children of an Indian allottee of any vested estate or constitutional rights.

Reed, District Judge, dissenting in part.

Appeal from the District Court of the United States for the Eastern District of Oklahoma; Ralph E. Campbell, Judge.

Suit by Tootie Riley, a minor, by U. C. Stockton, her guardian, and others, against Gabe E. Parker, as Superintendent for the Five Civilized Tribes, successor of Dana H. Kelsey, as United States Indian Superintendent, Union Agency, and another. From the decree (218 Fed. 391), defendants appeal. Affirmed.

Paul Pinson, Sp. Asst. U. S. Atty., of Muskogee, Okl. (D. H. Linebaugh, U. S. Atty., of Muskogee, Okl., and Carter Smith, Sp. Asst. U. S. Atty., of Tulsa, Okl., on the brief), for appellants.

W. J. Horton, of South McAlester, Okl. (R. A. Smith, of McAlester, Okl., on the brief), for appellee Riley.

C. H. Tully, of Eufaula, Okl., for other appellees.

Before SANBORN, Circuit Judge, and REED and BOOTH, District Judges.

SANBORN, Circuit Judge. On October 3, 1912, Tootie Riley, a minor, by her guardian, Julia Willingham, a minor, by her guardian, and Doc Willingham, the sole heirs at law of Emma Derrisaw Willingham, who before her marriage to Doc Willingham was Emma Derrisaw, a full-blood Creek Indian, made an oil and gas mining lease of 40 acres of land in Creek county, Okl., which had been allotted to Emma Derrisaw as her homestead, and provided in the lease that the royalties payable by the lessee should be paid, and they have been paid, to the United States Indian superintendent, Union agency, and to his successor, Gabe E. Parker, superintendent of the Five Civilized Tribes, who, together with W. M. Baker, cashier and special disbursing agent for the Five Civilized Tribes, now hold the same in trust for the benefit of the lessors. More than $15,000 are thus held and are ready for distribution, and the question in this case is when and in what way it should be divided among the lessors. The court below held that each of them was entitled to receive one-third thereof, and so decreed. From this decree the officers appeal, and their counsel present numerous objections and theories inconsistent with the adjudication below.

In the first place they contend that the approval of the lease by the Secretary of the Interior did not effect the removal of the restrictions on alienation of the part of the property which the lease granted to the lessee the right to take from it, and hence that the fund must be retained until 1931: (a) Because a removal of restrictions is expressly a distinct act from the approval of a lease; and (b) because an oil and gas mining lease is not an alienation of land. The first arugment in support of this contention is founded on the fact that in the disposition of the lands of the Indians Congress imposed more extensive restrictions upon their homesteads than upon their other allotted lands, and upon sections 1, 2, and 9 of the act of May 27, 1908 (35 Stat. 312, 315,

c. 199). These are the provisions of these sections material to this controversy:

Section 1: "All homesteads of said allottees enrolled as mixed-blood Indians having half or more than half Indian blood, including minors of such degrees of blood, and all allotted lands of enrolled full-bloods, and enrolled mixed-bloods of three-quarters or more Indian blood, including minors of such degrees of blood, shall not be subject to alienation, contract to sell, power of attorney, or any other incumbrance prior to April twenty-sixth, nineteen hundred and thirty-one, except that the Secretary of the Interior may remove such restrictions, wholly or in part, under such rules and regulations concerning terms of sale and disposal of the proceeds for the benefit of the respective Indians as he may prescribe. The Secretary of the Interior shall not be prohibited by this Act from continuing to remove restrictions as heretofore, and nothing herein shall be construed to impose restrictions removed from land by or under any law prior to the passage of this act."

Section 2: "Leases of restricted lands for oil, gas or other mining purposes, leases of restricted homesteads for more than one year, and leases of restricted lands for periods of more than five years, may be made, with the approval of the Secretary of the Interior, under rules and regulations provided by the Secretary of the Interior, and not otherwise."

Section 9: "That if any member of the Five Civilized Tribes of one-half or more Indian blood shall die leaving issue surviving, born since March 4, 1906, the homestead of such * * * allottee shall remain inalienable, unless restrictions against alienation are removed therefrom by the Secretary of the Interior in the manner provided in section 1 hereof, for the use and support of such issue, during their life or lives, until April 26, 1931, * * * in the event the issue hereinbefore provided for die before April 26, 1931, the land shall then descend to the heirs, according to the laws of descent and distribution of the state of Oklahoma, free from all restrictions."

Emma Derrisaw's homestead allotment was duly selected, allotted, and patented to her. In the year 1901 her daughter, Tootie Riley, was born. In July 1905, Emma Derrisaw and Doc Willingham intermarried, and as the result of this marriage Julia Willingham was born on February 11, 1907. In November, 1907, Emma Derrisaw Willingham died intestate. As Julia Willingham is her only issue born since March 4, 1906, the right to use and occupation of the homestead until April 26, 1931, is vested in her by the terms of section 9, subject to the termination of that right by her death before that time, or by the removal of restrictions on alienation from the land, either in whole or in part. Subject to this homestead right of Julia, the title to the land, according to the laws of descent and distribution of Oklahoma, vested in Tootie Riley, Julia Willingham, and Doc Willingham in fee in equal shares upon the decease of Emma Derrisaw Willingham. The fact that the lease was lawfully and regularly made and that it was duly approved by the Secretary is conceded.

[1] But counsel call attention to the declaration of section 9 to the effect that the homestead in cases of this class shall remain inalienable "unless restrictions against alienation thereof are removed therefrom by the Secretary of the Interior in the manner prescribed by section 1 hereof," and insist that the approval of the lease was ineffective to remove the restrictions on alienation from the leasehold or from the royalties collected from it, because the Secretary in the approval of the lease acted under section 2, and not under section 1 of the act of May 27, 1908. They also urge that under section 5 of the act (35 Stat. 313), which declares that any attempted alienation or incum-

brance by deed, mortgage, contract to sell, or other instrument or method of incumbering real estate, which affects the title to land allotted to allottees of the Five Civilized Tribes, prior to the removal of restrictions therefrom, and also any lease of such restricted land made in violation of law, shall be absolutely null and void, necessarily renders the attempted removal of any restriction upon alienation by the approval of a lease by the Secretary void unless the restriction upon alienation had been first removed by a prior proceeding under section 1. These arguments, however, seem too subtle and ingenious to be sound. Section 1 provides that the Secretary may remove the restrictions on alienation wholly or in part under such rules and regulations concerning terms of sale and disposal of the proceeds as he may prescribe. Section 2 provides that leases of restricted lands for oil, gas, or mining purposes approved by the Secretary under rules and regulations provided by him shall be valid. Valid leases of lands valuable for their oil, gas, or mineral result in the extraction and disposition of the most valuable part of the property and necessarily remove from that part of the property all restrictions upon alienation. If they failed to remove such restrictions, they would be ineffective and void. If approved under section 2 they necessarily remove the restrictions from the property in part under rules and regulations provided by the Secretary, and if restrictions were removed to the same extent under section 1 they would likewise be removed under rules and regulations provided by the Secretary.

Section 1 is indeed broader than section 2, and it authorizes the Secretary to remove the restrictions wholly as well as partly from the land; but as the whole is greater than any of its parts, and includes them all, section 1 includes the power to remove the restrictions on the leaseholds and their products which the Secretary is also empowered to remove by means of his approval of leases under section 2. It may be that the provision in section 9 that the homestead shall remain inalienable unless the restrictions are removed under section 1 refers to the removal of the restrictions wholly and not in part. However this may be, the court is without doubt that it was neither the intent of Congress nor is it the effect of that provision to invalidate leases approved by the Secretary under section 2, or to deprive them of the indispensable effect of valid leases, the removal of the restrictions on alienation from the leaseholds they evidenced, and the royalties they provide. Nor, since restrictions on alienation may be removed from leaseholds and their royalties either under section 1 or under section 2, is it essential to the validity of the removal under either section that the same or a like removal should have been first sought and procured under the other. This construction of this act is consonant with the cardinal rules that every statute should receive a rational, sensible interpretation, that the intention of the legislative body should be ascertained and given effect, if possible, and that this intention must be deduced, not from a part, but from the entire statute which expresses it, because the enacting body did not express its intention by a portion, but expressed it by all, of the law it passed upon the subject. On the other hand, the construction sought which would deprive oil and gas mining leases authorized by section 2 of the effect of the removal of

restrictions upon the alienation of the leaseholds and the royalties they evidence, and thus render them ineffective, flies in the face of the familiar maxim that "all the words of a law must have effect rather than that part should perish by construction." City of St. Louis v. Lane, 110 Mo. 254, 258, 19 S. W. 533; United States v. Ninety-nine Diamonds, 139 Fed. 961, 963, 72 C. C. A. 9, 11, 2 L. R. A. (N. S.) 185; Knox County v. Morton, 68 Fed. 787, 790, 15 C. C. A. 671, 675; Wrightman v. Boone County, 88 Fed. 435, 437, 31 C. C. A. 570, 572; Stevens v. Nave-McCord Mercantile Co., 150 Fed. 71, 75, 80 C. C. A. 25, 29.

[2] It is next said that the lease did not constitute an alienation of any part of the land, and that consequently its approval by the Secretary did not effect a removal of any restrictions on alienation. In support of this position counsel cite Duff v. Keaton, 33 Okl. 92, 124 Pac. 291, 42 L. R. A. (N. S.) 472, wherein the Supreme Court of Oklahoma held that an oil and gas lease was neither a conveyance nor a sale of a minor's land within the meaning of section 5314, Comp. Laws of Oklahoma 1909, so that it was not necessary for his guardian, in order to make such a lease on his behalf, to follow the procedure there prescribed to enable him to make a sale or conveyance of the land. But that court was careful to add:

"This conclusion does not militate against the rule announced in Eldred v. Okmulgee Loan & Trust Co., 22 Okl. 742, 98 Pac. 929. There it was held that a lease was an alienation within the terms of an act of Congress approved April 21, 1904 (33 Stat. 204, c. 1402), which reads: 'And all restrictions upon the alienation of lands of all allottees of either of the Five Civilized Tribes of Indians who are not of Indian blood, except minors, are, except as to homesteads removed'—wherein this court said: 'Hence we conclude that a lease conveys a leasehold estate; is an alienation by deed; is an alienation within the intent and meaning of the act of April 21, 1904, supra, upon which species of alienation restrictions by that act were removed.'" 33 Okl. 103, 124 Pac. 295, 42 L. R. A. (N. S.) 472.

They cite Kolachny v. Galbreath, 26 Okl. 772, 110 Pac. 902, 38 L. R. A. (N. S.) 451, which holds that a grant by lease of oil and gas, when it is in the ground, is a grant, not of the oil and gas in the ground, but of such part of the oil and gas as the lessee finds and reduces to possession, and that, as such a lease does not convey a corporeal hereditament, it will not sustain an action of ejectment. And such is also the holding by this court. Priddy v. Thompson, 204 Fed. 955, 960, 123 C. C. A. 277, 282. They cite Traer v. Fowler, 144 Fed. 810, 75 C. C. A. 540, State v. Evans, 99 Minn. 220, 108 N. W. 958, 9 Ann. Cas. 520, and other cases of like character, to the general rule that coal, iron, oil, gas, and other minerals derived from the ordinary and reasonable operation of opened mines constitute the rents and profits and not the body of the property, and belong to the owners of the former and not to the owners of the latter. But these decisions do not rule, nor did the judges in rendering them consider, the question here at issue. That question is: Does an oil and gas mining lease of a restricted homestead, made and approved under section 2 of the act of May 27, 1908, constitute an alienation thereof wholly or in part within the meaning of that act? Section 1 of that act declares that all homesteads of the class here under consideration "shall not be subject to alienation, contract to sell, power of attorney,

or any other incumbrance prior to April 26, 1931, except that the Secretary of the Interior may remove such restrictions wholly or in part" etc.

Oil and gas in the ground are a part of the land, and in this case they were the most valuable part of the land of the lessors. While a lease of such land, granting the exclusive right to find and extract all the oil and gas therein, conveys only that part of the oil and gas which the lessee finds and reduces to possession, and not all the fugacious oil and gas in the land, it nevertheless grants the right and gives the power to the lessee to extract and apply to his own use the most valuable part of the land of the lessors, their oil and gas in their ground; and when, as here, the execution of such a lease is followed by the discovery and extraction of valuable deposits of oil and gas thereunder, it not only conveys an incorporeal hereditament, but it effects the removal from the lessors of the title to the most valuable part of their land, for oil and gas in the ground is a part of the land of the owners of the latter. Such a lease becomes an alienation of that part of the land of the lessors which the lessee takes from it, converts into personal property, and appropriates to his own use. That it was not the intent of the members of Congress that such a lease should fall without the alienation they forbade is evident from the fact that such a result would have left property of incapable Indians of great value free from restrictions on alienation, and also from the fact that they thought it necessary to enact section 2 in order to provide a way by which such leases might, with the approval of the Secretary of the Interior, be relieved from the restrictions on alienation which they clearly believed had been imposed upon them by section 1. And the conclusion is that a lease of a restricted homestead for oil, gas, or other mining purposes under section 2 of the act of May 27, 1908, is an alienation of that part of the land constituting the homestead which the lease permits the lessee to take from it by the discovery and removal thereunder of the oil, gas, or other mineral therein. Moore v. Sawyer (C. C.) 167 Fed. 826, 835; Eldred v. Okmulgee Loan & Trust Co., 22 Okl. 742, 745, 746, 98 Pac. 929; Sharp v. Lancaster County, 23 Okl. 349, 100 Pac. 578, 579; Truskett v. Closser, 198 Fed. 835, 836, 838, 117 C. C. A. 477, 478, 480; Beck v. Flournoy Live Stock & Real Estate Co., 65 Fed. 30, 31, 34, 35, 12 C. C. A. 497, 498, 501, 502.

Another position of counsel for the appellants is that the approval of the oil and gas mining lease, and the consequent removal of the restrictions on alienation from that part of the homestead which consisted of the oil and gas in the ground which the lessee has taken and may take from the land under the lease, did not effect any change in the character or in the termination of any estate inherited by Julia Willingham, and that she still retained thereafter the same interest and estate in the land and in the homestead which she had previously held. The only question in this case is the extent of the respective interests of the three lessors in the fund which has been accumulated in royalties out of the oil and gas extracted under the lease. From that oil and gas, and from the part of the land which the lessee took from the lessors in order to obtain them, the restrictions upon alienation were removed on October

25, 1912, when the Secretary approved the lease. It is immaterial to the determination of the interests of these lessors in this fund what estates or interests they retain in that part of the land constituting the homestead not covered by the lease, and it is also immaterial whether or not the restrictions on alienation have been removed from that part of the land. Those questions are therefore here dismissed.

[3] Nor is it fatal to the decree of the court below that each of these three lessors is entitled to one-third of the fund in controversy that the estate or interest of Julia Willingham in the part of the land which the lessors granted to the lessee remained the same after the removal of the restrictions as before. When these restrictions were removed on October 25, 1912, the land was agricultural or grazing land. No oil or gas wells had been drilled, and no mines had been opened. Julia Willingham had the right during her life, until April 26, 1931, to the use and occupation of the land, and she, Tootie Riley, and Doc Willingham each owned one undivided one-third of the land in fee subject to that right. As an estate for life is the largest estate that right could possibly be, let us concede, without deciding, that the title of the three heirs was subject to an estate for life in Julia Willingham, and that her estates and interests in the lands were not terminated or changed by the removal of the restrictions on the alienation of the part of the land leased. As, when the restrictions were removed, there were no mines opened on the land, she, as owner of an estate for life, had no right to open any, and no right by virtue of her life estate to the royalties or rents and profits from any oil or gas that might be obtained from mines subsequently opened. The title to the oil and gas in the ground, and to the rents, profits, and royalties that might in the future be obtained from mines that were subsequently opened, was in the three owners of the fee. Lanyon Zinc Co. v. Freeman, 68 Kan. 691, 75 Pac. 995; Marshall v. Mellon, 179 Pa. 371, 36 Atl. 201, 35 L. R. A. 816, 57 Am. St. Rep. 601; Williamson v. Jones, 43 W. Va. 562, 27 S. E. 411, 38 L. R. A. 694, 64 Am. St. Rep. 891; Hook v. Garfield Coal Co., 112 Iowa, 210, 83 N. W. 963; Oolagah Coal Co. v. McCaleb, 68 Fed. 86, 15 C. C. A. 270; Ohio Oil Co. v. Daughetee, 240 Ill. 361, 88 N. E. 818, 36 L. R. A. (N. S.) 1108. If, therefore, as counsel argue, the removal of the restrictions on alienation from the part of the land subject to the lease neither terminated nor changed the character of the estates of the three parties interested in the land, Julia Willingham, who had no right to nor interest in the oil or gas in the lands, or in their future proceeds, before the removal of the restrictions by reason of her homestead right, had none thereafter by virtue of that right, and those proceeds were rightly decreed to the three owners of the fee share and share alike.

[4] Moreover, if this conclusion were erroneous, a careful study of section 9 has satisfied that the homestead right of Julia Willingham in reality never rose to the dignity of an estate for life in any part of the land allotted to Emma Derrisaw. The purpose and effect of the act of July 28, 1908, was not to create estates, but to limit the extent of and to remove restrictions upon alienation. United States v. Knight, 206 Fed. 145, 124 C. C. A. 211. This homestead was originally vested in Emma Derrisaw, the allottee, and remained inalienable after the

death of that allottee for the use and support of her issue. Section 9 of the act of May 27, 1908, which limited the duration of the restrictions on its alienation and the time during which Julia Willingham had the right to it for her use and support, provided that neither should continue beyond April 26, 1931, in any event, and that both might be terminated at any time before that date, either by the death of Julia or by the removal by the Secretary of the restrictions on its alienation. The contention of counsel that the clause "unless restrictions against alienation are removed therefrom by the Secretary of the Interior in the manner provided in section 1 hereof," in the provision in section 9 that if the allottee of one-half or more Indian blood shall die leaving issue surviving born since March 4, 1906, "the homestead of such deceased allottee shall remain inalienable, unless restrictions against alienation are removed therefrom by the Secretary of the Interior in the manner provided in section 1 hereof, for the use and support of such issue, during their life or lives, until April 26, 1931," limits the word "inalienable" only, and does not limit the duration of the right of such issue to the homestead for their use and support, has received consideration and meditation, but it has not proved persuasive. The subject of the act, which was restrictions on alienation, the purpose of its enactment, which was to limit and remove them, and the plain terms of this provision, convince that its true construction is that restrictions on the alienation of, and the right of the issue to, the homestead for their use and support, terminated at the same time, whether that termination is wrought by the removal of the restrictions on alienation by the Secretary, by the death of the issue before May 26, 1931, or by the arrival of that date. And the result is that, even if Julia Willingham ever had any homestead right for her use and support in the part of the land of the lessors granted by the lease, it did not constitute an estate for life, it did not rise higher than an estate for years defeasible during its term by her death, or by the removal of the restrictions on its alienation by the Secretary, and, as the Secretary removed all restrictions on the alienation of that part of the land by his approval of the lease on October 23, 1912, her homestead right to it for her use and support, if she ever had any, then terminated. And the conclusion is that, because Julia Willingham never had, by virtue of her homestead right, any estate for life in or right to the part of the land here in controversy that was leased, or to the proceeds thereof for her use and support, and because, even if she had any estate or interest therein, it was terminated on October 23, 1912, when the restrictions on its alienation were removed, she is entitled to no larger share of the royalties derived from the lease than is each of the other lessors.

In opposition to this result the decision of the Supreme Court of Oklahoma in Barnes v. Keys, 36 Okl. 6, 127 Pac. 261, 45 L. R. A. (N. S.) 178, Ann. Cas. 1915A, 515, Wilson v. Youst, 43 W. Va. 826, 28 S. E. 781, 787, 39 L. R. A. 292, Ammons v. Ammons, 50 W. Va. 390, 40 S. E. 490, 494, Eakin v. Hawkins, 52 W. Va. 124, 43 S. E. 211, 212, Stewart v. Tennant, 52 W. Va. 559, 44 S. E. 223, 229, and Blakley v. Marshall, 174 Pa. 425, 34 Atl. 564, have been cited. The opinions in

these cases and in Higgins Oil & Fuel Co. v. Snow, 113 Fed. 433, 437, 439, 51 C. C. A. 267, 271, 273, and Raynolds v. Hanna (C. C.) 55 Fed. 783, have been examined and thoughtfully considered. They rest on the proposition that, although the owner of a life estate may not lawfully open mines and extract and appropriate to his own use minerals from unopened land, yet, where the owner of the life estate in mineral land and the remaindermen join in a mining lease for the purpose of opening and operating mines in the land, the life tenant is entitled to receive a part of the royalties proportionate to the value of his life estate.

The facts in these cases, however, differ so radically from those of the case at bar that the decisions in them, not only fail to rule this case, but they fail to persuade that the conclusion by the court below and now by this court is erroneous. For example, Barnes v. Keys, was a partition suit between the owners of the life estate in mineral land and the remaindermen. The life expectancy of the estate was 38 years. The trial court had heard, considered, and found the respective proportional values of the life estate and the estate of the remaindermen in the land which they had jointly leased for mining purposes. It had found that the value of the life estate was 80 per cent. of the entire value of the property and the value of the estate of the remaindermen only 20 per cent. of that value, and upon the basis of that finding the Supreme Court of Oklahoma held that the owners of the life estate were entitled to receive interest on the royalties at 6 per cent. per annum from the times when they were respectively ·produced until the expiration of the life estate. In the case at bar there is no life estate. Even if there was a defeasible estate for years in the part of the land leased, that was terminated by the removal of the restrictions on the alienation of that part when the lease was approved, and before the mine was opened or any of the royalties were collected. The court below did not find in this case that the homestead right of Julia Willingham in the part of the land leased, or in the whole body of the land, ever had any value, but it adjudged that she was entitled to no part of the royalties on account of her homestead right and that was in effect a finding that her homestead right in the part of the land leased was of no value, and there is no evidence in the record that it had any value. Because the legal proposition on which the cases cited by counsel for the appellants relative to this subject are founded is inapplicable to the facts of this case, and because the facts in those cases are not analogous to the facts in the case at bar, the opinions in those cases fail to satisfy that the conclusion of the court below that Julia Willingham was entitled to no part of, or interest in, the royalties under the lease, was not just and equitable.

[5] Finally, counsel for the appellants, after exhaustively discussing the rights and interests of the lessors on the theory that they are measured by the provisions of the act of May 27, 1908, propose near the end of their brief a new theory, which they concede that they did not present to the court below, to the effect that conceivable estates differing from those resulting from the act of 1908 were vested in Tootie Riley and Julia Willingham by section 7 of the Original Creek Agreement

(Act March 1, 1901, c. 676, 31 Stat. 861) or by section 16 of the Supplemental Creek Agreement, which took the place of section 7 (Act June 30, 1902, c. 1323, 32 Stat. 500), which estates could not constitutionally be and were not devested or modified by the act of 1908, by virtue of which conceivable estates Tootie Riley and Julia Willingham are each entitled to one-half of the royalties under the lease as joint owners of the fee to the land from which they are derived, or that they are entitled as joint life tenants to the interest on the royalties. Section 7 of the Original Creek Agreement provided that the homestead of each citizen should be inalienable for 21 years, and should remain after the death of the allottee for the use and support of children born to him after the ratification thereof, which was made on May 25, 1901, and Tootie Riley and Julia Willingham were born after that date. Section 16 of the Supplemental Creek Agreement (32 Stat. 500) declares that such homestead shall be and remain nontaxable, inalienable, and free from any incumbrance whatever for 21 years from the date of the deed therefor, and that it shall remain after the death of the allottee for the use and support of children born to him after May 25, 1901.

The arguments of counsel in support of their new theory have not proved convincing. They are ingenious and subtle. But they do not tend to lead to clarity and certainty, but to confusion and doubt. Suffice it to say upon this subject that, in view of the opinion of the Supreme Court in Tiger v. Western Development Company, 221 U. S. 286, 304, 306, 307, 308, 309, 311, 313 and 316, 31 Sup. Ct. 578, 55 L. Ed. 738, and of the later decisions which have quoted and followed that opinion, our conclusion is that the provisions of the act of May 27, 1908, relative to the rights and interests of these lessors so far as they are in any respect repugnant to and inconsistent with those of the original or the Supplemental Creek Agreement relative to the same subject, repealed to the extent of that repugnancy and became substitutes for those earlier provisions, that they did not deprive any of the parties in interest here of any of their vested estates or constitutional rights, and that the rights and interests of these parties are governed and measured by the provisions of the act of May 27, 1908.

Let the decree below be affirmed.

REED, District Judge (dissenting in part). The restrictions upon alienation of the oil and gas deposits in the homestead of Emma Derrisaw, a full-blood citizen of the Creek Nation, the allottee of the land in question, if removed at all, other than by her death, were removed by the approval of the oil and gas mining lease of October 3, 1912, by the Secretary of the Interior on November 9, 1912. Admitting for the present that the Secretary of the Interior, in view of section 6 of the act of Congress approved May 27, 1908 (35 Stat. c. 199, p. 315), was thereafter authorized to approve such leases to effect the removal of such restrictions, the question is: To what share, if any, of the royalties in the custody of the superintendent of the disbursing agency of the Five Civilized Tribes arising from the lease of such premises is the minor defendant Julia Willingham now entitled, she being the only child of Emma Derrisaw deceased intestate, born since March 4, 1906,

and restrictions upon the alienation of her homestead not having been removed prior to her death?

It seems to be conceded that section 9 of the act of May 27, 1908, controls the determination of this question. That section in full reads in this way:

"Sec. 9. That the death of any allottee of the Five Civilized Tribes shall operate to remove all restrictions upon the alienation of said allottee's land: Provided, that no conveyance of any interest of any full-blood Indian heir in such land shall be valid unless approved by the court having jurisdiction of the settlement of the estate of said deceased allottee: Provided further, that if any member of the Five Civilized Tribes of one-half or more Indian blood shall die leaving issue surviving, born since March fourth, nineteen hundred and six, the homestead of such deceased allottee shall remain inalienable, unless restrictions against alienation are removed therefrom by the Secretary of the Interior in the manner provided in section one hereof, for the use and support of such issue, during their life or lives, until April twenty-sixth, nineteen hundred and thirty-one; but if no such issue survive, then such allottee, if an adult, may dispose of his homestead by will free from all restrictions; if this be not done, or in the event the issue hereinbefore provided for die before April twenty-sixth, nineteen hundred and thirty-one, the land shall then descend to the heirs, according to the laws of descent and distribution of the state of Oklahoma, free from all restrictions: Provided further, that the provisions of section twenty-three of the act of April twenty-sixth, nineteen hundred and six, as amended by this act, are hereby made applicable to all wills executed under this section."

Other provisions of the act of May 27, 1908, that may bear upon this question are:

Section 2 as set forth in the majority opinion further provides: "That the jurisdiction of the probate courts of the state of Oklahoma over lands of minors * * * shall be subject to the foregoing provisions. * * *"

"Sec. 5. That any attempted alienation or incumbrance by deed, mortgage, contract to sell, power of attorney, or other instrument or method of incumbering real estate, made before or after the approval of this act, which affects the title of the land allotted to allottees of the Five Civilized Tribes prior to the removal of restrictions therefrom, and also any lease of such restricted land made by violation of law before or after the approval of this act shall be absolutely null and void."

"Sec. 6. That the persons and property of minor allottees of the Five Civilized Tribes shall, except as otherwise specifically provided by law, be subject to the jurisdiction of the probate courts of the state of Oklahoma."

And further provisions of this section empower the Secretary of the Interior, under rules and regulations prescribed by him, to exercise supervision and control over all guardians of minors, to the end that their estates in restricted and other lands shall be preserved and their property protected for the benefit of said minors, and the probate courts may in their discretion appoint any representative of the Secretary as guardian for such minors, without fee or charge.

Upon the death of Emma Derrisaw intestate (the restrictions against alienation of the homestead not having been previously removed, and issue born to her since March 4, 1906, surviving her), section 9 of the act conferred upon her minor child, Julia Willingham, who was born since March 4, 1906, the sole right to the use of the homestead for her support until April 26, 1931, unless she should die prior to that date, when her right would cease and the land then descend to the heirs of her mother Emma Derrisaw Willingham. The minor Julia is still liv-

ing, or was at the time of the hearing in the court below, and that court held, as I read its opinion, that, upon the death of Julia's mother intestate, this minor became entitled only to such use of the land as she might make of it, with the restrictions against its alienation still existing; that the use contemplated by the statute did not permit the lease of the land for oil and gas mining purposes, because that would amount to a disposition of that part of the corpus of the property and prevent its going to the heirs of the allottee at the expiration of the minor's term as granted by section 9, and would in effect be a conversion for the benefit of the minor of that part of this homestead property; that the minor could not therefore rightly be allowed anything from the proceeds arising from the oil and gas mining lease for her support during the term granted by that section.

I am unable to concur in that part of the decree, for under section 9 upon the death of Emma Derrisaw intestate all restrictions against the alienation of this homestead were removed and it then descended to her heirs under the statute of Oklahoma, subject to the right of her heirs born since March 4, 1906, the child Julia being the only heir so born. The restrictions against alienation it is true had not, previous to her death, been removed in the manner provided by section 1 of the act; but under section 9 all restrictions upon her land, including this homestead, were removed by her death. The removal of the restrictions is, of course, for the purpose alone of permitting alienation of the land. United States v. Knight, 206 Fed. 145, 124 C. C. A. 211. And unless alienation is in fact made the rights of parties in the land, other than the right of alienation, it seems to me are not affected. But if it be conceded that the removal alone of the restrictions by the Secretary of the Interior can deprive the minor Julia of her right to the use of this homestead for the purpose for which it was granted to her, clearly she could not be deprived of such right until the restrictions are so removed, which in this case was not until November 9, 1912, four years after the death of her mother and after her right to the use thereof had fully vested in her. The clause of section 9 which reads, "unless restrictions against alienation are removed therefrom by the Secretary of the Interior in the manner provided in section one hereof," has reference to and limits the word "alienation," and does not affect the right in or to the land other than the right to alienate or incumber it. Emma Derrisaw died intestate in November, 1908, seised in fee of this homestead, the restrictions upon its alienation not having been previously removed, but were removed under section 9 of the act by her death. No alienation of the land, or of its oil and gas deposits, or will of Emma Derrisaw, having then been made, its descent was then cast upon her legal heirs, subject, however, to the rights of the child Julia under section 9, who was born since March 4, 1906, to its use for her support until April 26, 1931, or until her death should that occur before that date.

I am unable to bring myself to believe that the right of Julia to the use of this entire homestead property, if necessary for her support, which vested in her on the death of her mother in November, 1908, could be devested by the approval of the Secretary of the Interior four years later. Jones v. Meehan, 175 U. S. 1, 32, 20 Sup. Ct. 1, 44 L. Ed.

49. Conceding, for the present, that under section 6 of the act of May 27, 1908, the Secretary of the Interior was authorized to approve the lease after the death of Emma Derrisaw (sections 11, 12, and 13 of article 7 of the Constitution of Oklahoma, and sections 3330, 3335, 6447, 6532, 6554, and 6569 of the Revised Laws of Oklahoma [1910], which confer upon the proper county court of the state of Oklahoma, jurisdiction of the persons and property of minors in that state), it seems clear that the right of the minor Julia to this entire homestead property, or the income from or proceeds of this homestead, for her support during the term granted by section 9, is not, and cannot rightly be, barred by the approval of the lease by the Secretary of the Interior in November, 1912. Jones v. Meehan, 175 U. S. 1, 32, 20 Sup. Ct. 1, 44 L. Ed. 49, above. If this be not true, then, if the homestead is not susceptible of use for agricultural or similar purposes, the minor would be deprived of all means of support from its use during the term for which it was granted to her. See Mallen v. Ruth Oil Company et al., 231 Fed. 845, 146 C. C. A. 41.

It also seems clear that the royalties received under this oil and gas mining lease, deposited with the disbursing agency of the Five Civilized Tribes, are rent and income from that part of this homestead, which may be rightly used for the support of this minor, and only such of the proceeds or income thereof as remains after a reasonable support has been furnished to the minor therefrom during the term of her right to the use thereof can rightly be distributed to the heirs, including this minor, of Emma Derrisaw. The Congress, in enacting section 9 of this act, was not concerning itself with any technical definition or meaning of the estate or interest in the homestead right to which the children of allottees of lands in the Creek Nation born since March 4, 1906, would be entitled under that section, for it grants to such children the right to the use of such estate, whatever the legal definition of that right may be, for their support during the term granted. In Jones v. Meehan, above, it is said, in construing any treaty between the United States and an Indian tribe, it must always be borne in mind that the treaty must be construed, not according to the technical meaning of its words to learned lawyers, but in the sense in which they would naturally be understood by the Indians, citing Worcester v. Georgia, 6 Pet. 515, 582, 8 L. Ed. 483; Choctaw Nation v. United States, 119 U. S. 1, 27, 28, 7 Sup. Ct. 75, 30 L. Ed. 306; and the same rule should apply in construing the acts of Congress, since the government has adopted that method of dealing with Indians, instead of by treaty.

That the right granted is not a life estate may be admitted; but that it is a right to use it for a term of years, subject to the termination of that right by her own death, or the death testate of her mother, prior to the expiration of the term granted, cannot be doubted. The oil and gas deposits in this land are of a migratory character, and probably its principal value, and may be exhausted by the operation of oil and gas wells upon land adjacent or near thereto, or dissipated from other causes long before the year 1931, and thus the allottee, or upon her death her heirs, deprived of the principal value and source of revenue from this land. Mallen v. Ruth Oil Co. et al., 231 Fed. 845, 849, 146 C.

C. A. 41, and Barnes v. Keys, 36 Okl. 6, 127 Pac. 261, 45 L. R. A. (N. S.) 178, Ann. Cas. 1915A, 515. See, also, as bearing upon this question: Raynolds v. Hanna (C. C.) 55 Fed. 783, 801, and cases there cited; Lacey v. Newcomb, 95 Iowa, 287, 294, 63 N. W. 704, and its citations; State v. Evans, 99 Minn. 220, 108 N. W. 958, 9 Ann. Cas. 520, and note; Appeal of Bedford, 126 Pa. 117, 17 Atl. 538. It was therefore to the interest of all the heirs of the allottee, Emma Derrisaw, that the oil and gas deposits in this homestead should be disposed of at an opportune time, and the proceeds arising therefrom invested or otherwise conserved for the support of the minor Julia during the term for which she is entitled to the use thereof, and the remainder for the benefit of all the heirs after the expiration of such term.

The fact that the oil wells had not been drilled prior to the death of Emma Derrisaw is quite immaterial; for by the lease of the adult, and the minor heirs by their guardian, under authority of the probate court, it was intended that the oil and gas deposits should be removed from the land, and the lease authorized the sinking of requisite wells, in order that such deposits might be removed and the proceeds conserved, as before stated.

As to the minor defendant, Tootie Riley, and the defendant Doc Willingham, it appears that Tootie Riley was born prior to March 4, 1906, but whether before or after September 1, 1902, does not definitely appear; but, whether before or after that date, she was entitled to enrollment as a member of the Creek Nation, and to participate in the allotment and distribution of its lands and funds under the acts of April 26, 1906 (34 Stat. c. 1876, p. 148), and June 21, 1906 (34 Stat. c. 3504, pp. 325, 341), amending the act of 1902, as held in the case of Gritts v. Secretary of the Interior, 224 U. S. 640, 32 Sup. Ct. 580, 56 L. Ed. 928. Doc Willingham married Emma Derrisaw in July, 1905, and the minor Julia is the issue of that marriage, born February 11, 1907. Neither the minor Tootie Riley nor Doc Willingham is therefore entitled to anything under the act of May 27, 1908, except as they may inherit from the allottee Emma Derrisaw, and as such heirs their rights are subject to the right of the minor Julia Willingham in this homestead; and it seems to me that the purpose of section 9 of that act is to enable minor children born since March 4, 1906, to have the use of the homestead of their parents dying intestate for the term granted by that section, and it should be given a liberal construction to effectuate that purpose.

Whether or not the provisions of section 6 of the act of May 27, 1908, which confers upon the probate courts of Oklahoma jurisdiction of the persons and property of these minors, deprives the Secretary of the Interior of the right to remove restrictions against alienation of the property of such minors after their rights become vested, is a question not raised in the trial court, has not been discussed here, and need not be considered.

The record fails to show what amount of the royalties arising from the lease in question will be sufficient for the reasonable support of the minor Julia during the term for which she is entitled to such use; the cause should be remanded to the District Court, to ascertain the reason-

able value of such support, and to provide for its payment to her out of the royalties now in the custody of the superintendent or disbursing agency of the Five Civilized Tribes, or that it may hereafter receive for such royalties, before the remainder of such fund is distributed to the legal heirs of Emma Derrisaw.