STATE v. MABEL EVANS and Others.[1]

September 7, 1906.

Nos. 14,728—(27).

**Mineral Lease Act.**

Chapter 22, p. 68, of the Laws of 1889 and the amendments thereto, providing for the issuance of mineral leases and contracts, are constitutional.

Appeal by plaintiff from a judgment of the district court for St. Louis county, entered pursuant to the findings and order of Dibell, J. Affirmed.

*Edward T. Young,* Attorney General, *Royal A. Stone,* Assistant Attorney General, and *W. B. Douglas,* for the State. .

*Washburn, Bailey & Mitchell, Davis, Kellogg & Sevenance,* and *Joseph B. Cotton,* for respondents.

START, C. J.

This action was brought in the district court of the county of St. Louis to set aside a certain mineral lease and contract, dated December 30, 1902 and November 20, 1903, issued on behalf of the state by its land commissioner to the defendant Mabel Evans, on the alleged ground that they were obtained by fraud and conspiracy, and further, that the statute purporting to authorize the execution of mineral leases on behalf of the state is unconstitutional. The trial court found that the allegations of fraud and conspiracy were not sustained by the evidence; that the mineral lease and contract in this case were made on behalf of the state pursuant to the statute, and in accordance with the ordinary course of business of its land department, but there was no public sale thereof or prior appraisement; that the lease and

1 Reported in 108 N. W. 958.

contract related to 36.65 acres of land, acquired by the state under the swamp land act, known as "lot 1 in section 6, township 58½, range 17" in the county of St. Louis, which was then entirely unexplored, and undeveloped; that the lessee by the lease was authorized to enter upon the land for the purpose of prospecting for iron ore thereon, and the contract was in the form, and contained the provisions required by the statute.

The trial court further found that the term "merchantable shipping iron ore" means iron ore, which, at the time it is mined, can be mined, shipped, and sold at a profit; its merchantability varies from time to time, and that all the mines in Minnesota contain both merchantable and nonmerchantable ore; that under the mineral contract here in question the land has been partially explored, showing that merchantable and nonmerchantable ore exists therein, the extent whereof is not known, and that aside from the minerals and mineral rights therein, the value of the land does not exceed $10 per acre; that since the adoption of the mining lease law of 1889, the state, through its land commissioner, has issued four thousand three hundred thirteen mineral leases upon its swamp and school lands for which it has been paid the sum of $109,628.50; that it has executed six hundred forty-three mineral contracts on such lands for which it has been paid the sum of $178,300 in annual rentals where ore was not mined; and that it has been paid $542,281.96 in royalties on ore mined and removed under such mineral contracts; that since the enactment of the law private parties have expended not less than $1,300,000 in exploratory and preliminary work preparatory to taking out and removing iron ore from state lands so leased, in some cases preparatory to mining operations which may extend over a period of years, and more than $1,100,000 has been paid by individuals and corporations upon the purchase and transfer of such mineral contracts after the lands covered by such contracts had been explored at large expense, and ore discovered therein; and that all of such things have been done in reliance upon the validity of the mineral lease law and the construction placed upon the provisions of the constitution respecting the management and disposition of the state school and swamp lands, since the enactment of the law, by the departments of the government of the state and people thereof, during which time, and until

the commencement of this action, the constitutionality of the law has not been questioned.

As a conclusion of law, the trial court found the statute authorizing the execution of the mineral lease and contract constitutional, and denied the state any relief in the premises. Judgment was so entered from which the state appealed. The facts found are not here challenged, and the sole question for our decision is whether the mineral lease statute violates the constitution of the state, which provides that no portion of the school or swamp lands of the state shall be sold otherwise than at public sale. The statute (Laws 1889, p. 68, c. 22, as amended by Laws 1895, p. 227, c. 105; Laws 1897, p. 578, c. 312, and Laws 1903, pp. 330, 562, chapters 225 and 317), was substantially re-enacted by R. L. 1905, §§ 2483–2495.

The salient provisions of this statute are these: The state reserves for its own use all the iron and other minerals in all lands owned by it. To encourage the development of mineral deposits on land of the state, the land commissioner is authorized to issue, on application and payment of $25 therefor, a permit or license which authorizes the holder thereof to enter upon the land therein described, for the purpose of prospecting, examining, and sinking test pits for iron ore. The permit expires by express limitation in one year from its date. The holder of this first lease or prospecting permit has the right at any time prior to its expiration to receive from the land commissioner a mining contract or lease, whereby the state leases the land to such holder for the term of fifty years for the purpose of exploring, mining, taking out, and removing therefrom the merchantable iron ore there found, with the right to erect and maintain all necessary structures and appliances necessary for mining and removing the iron ore. The lessee is required to pay an annual rental of $100 until the expiration of the time within which the first thousand tons of ore is to be mined, which must be done within five years after the completion of a railroad within one mile of the land, and annually thereafter he must pay a royalty of twenty five cents per ton on all iron mined and removed from the land, such royalty to be paid annually on at least five thousand tons whether that amount is mined or not. The lessee is also required to open, use, and work the mines in such manner as is usual in skilful mining operations by the proprietors thereof, and

to pay the taxes assessed against the land, the improvements thereon, and the .iron ore, the same as if he were the owner in fee of the leased land. The state reserves the timber on the land with the right to sell and dispose of it. In case copper or any valuable mineral other than iron should be discovered on the land, the conditions on which it may be mined may be agreed upon by the parties or by a reference to arbitrators. The right of re-entry for condition broken is reserved by the state. No provision is made by the·statute for any public sale of leases; but in cases where there are two or more applicants for a prospecting permit for the same land, provision is made for its sale to the applicant who is the highest bidder therefor.

Is this method of developing and disposing of the iron ore on state lands prohibited by the constitution? It is the contention of counsel for the state that the question must be answered in the affirmative, because the statute in legal effect provides for a sale of a portion of the state lands at private sale at a price fixed by the legislature.

The mineral lease here in question is for a tract of swamp land, but by the amendment of 1881 to section 2 of article· 8 of our state con-stitution, the sale of all swamp lands of the state was placed under the same and no greater limitations than the sale of school lands. If the provision as to the sale of swamp lands had been in the form of an independent amendment to the constitution, there might have been some question as to its true meaning. It is, however, an amendment to the particular section of the constitution prohibiting the sale of school lands, except at public sale, and providing for the investment and preservation of the fund arising from any sale or other disposition thereof. It is quite obvious from a reading of the whole section, as amended, that·the purpose of the amendment was to place swamp lands as to a sale thereof on the same basis as school lands, and not to in-corporate in the constitution, by the use of general language, statutory provisions as to the details for the sale of school lands. This mineral lease statute does not purport to deal with agricultural lands, hence section 15, article 1; of the constitution, declaring void all leases of agricultural land for a longer period than twenty one years, has no application to the question under consideration. Minneapolis Mill Co. v. Tiffany, 22 Minn. 463.

It follows, then, that the statute is constitutional, unless it provides for a sale of the school and swamp lands of the state within the meaning of section 2, article 8, of the constitution, which provides in effect that the proceeds of school lands shall remain a perpetual school fund; that no portion of such lands shall be sold otherwise than at public sale, that is to the highest bidder at auction; that the principal of all funds arising from sales or other disposition of such lands shall forever be preserved inviolate and undiminished; and that the income arising from the lease or sale of lands shall be distributed to the different townships of the state in proportion to the number of scholars in each.

It is to be noted that the only limitation upon the unquestioned power of the legislature, in the absence of constitutional restrictions, to dispose of the public domain as it sees fit, relates solely to a sale of the lands, and that the right to lease or otherwise dispose of the land is not prohibited but expressly recognized by the constitution. See Smith's Minn. Cons. Debates, 438. The presumption that the legislature had the power to pass the statute in question and that it is constitutional is conclusive, unless it is clear that the method adopted by the legislature for the development and disposition of the mineral resources of the state is prohibited by this section 2, article 8, of the constitution. The purpose of the provision prohibiting a sale of any school lands except at public sale is, as stated by counsel for the state, to foster and conserve the school fund, to prevent school lands from being sold at an inadequate price, and to secure competition therefor, and to guard against favoritism in the disposition thereof. The framers of our constitution, instructed by the experience of other states that had disposed of their school lands at from twenty five to fifty cents per acre, and had frittered away the proceeds thereof by unwise legislation (see Smith's Minn. Cons. Debates, 440, and Andrews Minn. Cons. Debates, 252), wisely placed this prohibition in the constitution. This purpose of the masterful men, who wisely organized and faithfully fostered the educational institutions of our state, must not be impaired by any technical construction of this constitutional provision. On the other hand, if the statute providing for mineral leases is not clearly within the prohibition, it must be held to be valid. The pivotal question is, whether the prohibition that no portion of the

school or swamp lands of the state shall be sold otherwise than at public sale includes mineral leases of the kind authorized by the statute. The term, no portion of the lands, as used in the constitution, does not refer to the separate substance or product of a particular tract of land. The prohibition is general in its terms, and provides that no part of the school lands, that is, none of them, shall be sold otherwise than at public sale. Any other construction would be not only contrary to the plain import of the words used, but also contrary to the practical construction thereof by the first legislature assembled after the adoption of the constitution, as evidenced by a statute providing for the sale of grass on school lands, which, until severed, is a part of the land. Kirkeby v. Erickson, 90 Minn. 299, 96 N. W. 705, 101 Am. St. 411; Laws 1858, p. 135, c. 58, § 1.

Again, by Laws 1863, p. 50, c. 12, § 8, the commissioner of the land office was authorized to sell from year to year the right to cut grass, gather cranberries, and make maple sugar upon the school lands of the state. See G. S. 1866, c. 38, § 52, and R. L. 1905, § 2440.

The term sale, as ordinarily used, and as it is used in the constitution in reference to the disposition of school lands, means the transfer of the absolute or general property in the thing sold. In determining whether a mineral lease of the kind here in question is a sale, neither the name nor form given to it by the statute is controlling. The legal effect of the transaction determines its classification, not its form. Morrison v. St. Paul & N. P. Ry. Co., 63 Minn. 75, 65 N. W. 141, 30 L. R. A. 546. In the case cited, which was approved in County of Traverse v. St. Paul, M. & M. Ry. Co., 73 Minn. 426, 76 N. W. 217, it was held that a lease of a railroad, including its right of way, for nine hundred ninety nine years, was not a sale of the right of way. The specific contention of the state is that the mineral leases and contracts authorized by the statute, if names and forms be disregarded, are, in their legal effect, a sale of all of the iron ore in place on or in the land demised, which is a distinct part thereof; that such sale of the ore necessarily contemplates the consumption of a portion of the land and the possible exhaustion of substantially all of value in it, and that such a transaction is, essentially, a sale of a portion of the land, and not a lease of it. The contention of the state that iron ore in

99 M.—15

place is a part of the land, that there may be a separate ownership of the surface and the minerals of land, that the mineral leases in question create an interest in the land, and that contracts with reference to iron ore in place are within the statute of frauds, must be, and is, conceded. However, it by no means follows from this concession that the mineral leases authorized by the statute are in legal effect a sale of the land within the meaning of the constitution, for many of the matters conceded are common to sales and leases of real estate.

The question of the validity of such leases involves a consideration of the law applicable thereto, and the means of obtaining a revenue from mines as they existed at the time of the adoption of our state constitution. We have been greatly aided in such consideration by the exhaustive citation and able analysis of the adjudged cases in the briefs of counsel for the respective parties. The customary method of developing, working, and obtaining profits from mineral lands, at the time of the adoption of our constitution, was by means of mineral leases similar to those in question. The removal of ore from the demised land was not deemed waste, but a legal and reasonable way of securing the profits of the land. The lessee for life or years of land was, by the common law, authorized to operate and take the profits of open mines, although the lease was silent as to mines, but he could not open new mines even when the land was let with the mines; if, however, the land was let with the mines, and there were then no open mines on the land, the lessee might open new mines and take the profits thereof. Coke Littleton, 53b; Clegg v. Rowland, L. R. 2 Eq. 160.

The conclusion to be drawn from the English cases, as clearly and correctly stated by the learned trial judge, is this: "That from the very beginning the rights of the man who owned the land, and of the man who took away the minerals from it, were worked out through the law of tenancy, without the aid of the law of sales. That it was never a conception of the law that the man who took away the mineral got his title through a sale by the owner of the land; but the theory was that the mineral was the product of the use for which rent was paid, and that the tenant got his title to his mineral by an appropriate use of the demised premises. That it was never a circumstance of significance that the use of the demised premises, in accord-

ance with the intent of the parties and in accordance with the nature of the use to which they could be put, resulted in the gradual consumption or even exhaustion of the portion of the land of chief worth."

A consideration of the cases in this country leads to a like conclusion. The propriety of a lease for the purpose of developing and working mines is recognized by all of the cases, and the rule established by the great weight of authority that such leases do not constitute a sale of any part of the land, and, further, that iron or other materials derived from the usual operation of open mines or quarries, constitute the rents and profits of the land, and belong to the tenant for life or years, and to the mortgagor after sale on foreclosure and before the expiration of the time for redemption. The rule, however, has no application to unopened mines in the absence of a contract, express or implied, for opening and leasing them. See Diamond Iron Min. Co. v. Buckeye Iron Min. Co., 70 Minn. 500, 73 N. W. 507; U. S. v. Gratoit, 14 Pet. 526, 10 L. Ed. 573; Raynolds v. Hanna (C. C.) 55 Fed. 783; Traer v. Fowler (C. C. A.) 144 Fed. 810; Tennessee Oil Gas & Mineral Co. v. Brown, 131 Fed. 696, 65, C. C. A. 524; Gartside v. Outley, 58 Ill. 210, 11 Am. 59; Consolidated v. Peers, 150 Ill. 344, 37 N. E. 937; Lenfers v. Henke, 73 Ill. 405, 24 Am. 263; Genet v. Delaware, 136 N. Y. 593, 32 N. E. 1078, 19 L. R. A. 127; Ganter v. Atkinson, 35 Wis. 48; Brown v. Beecher, 120 Pa. St. 590, 15 Atl. 608; Neel v. Neel, 19 Pa. St. 323; Owings v. Emery, 6 Gill, .260; Harlow v. Lake Superior, 36 Mich. 105; Ward v. Carp, 47 Mich. 65, 10 N. W. 109; Gaines v. Green Pond, 33 N. J. Eq. 603; Knight v. Indiana, 47 Ind. 105, 17 Am. 692; Lacey v. Newcomb, 95 Iowa, 287, 63 N. W. 704; Austin v. Huntsville, 72 Mo. 535, 37 Am. 446.

In view of the use of mining leases for centuries as a means whereby mines have been opened and worked and the law applicable to such leases, there can be no fair doubt that if there were open mines upon any of the school or swamp lands of the state, it could lease the mines, and authorize the lessee to mine and remove the ore upon payment of a royalty. And, further, that such leasing of the mines would not be a sale within the meaning of the constitutional prohibition of a sale of any portion of such lands. We do not understand that this conclusion is contested by the state.

Again there is no constitutional limitation upon the power of the legislature to provide for the exploration by the state of its own lands for iron ore, and for the opening of mines in case ore be found thereon. Such action by the state would not constitute a work of internal improvement within the meaning of the constitutional prohibition that "the state shall never contract any debts for works of internal improvement or be a party in carrying on such works." . Rippe v. Becker, 56 Minn. 100, 57 N. W. 331, 22 L. R. A. 857.

If, then, the state may explore its lands, and, when iron ore is found thereon, open the mines, and then lease them, the distinction between open and unopen mines would seem to be immaterial, so far as the question of the constitutionality of this mineral lease statute is concerned. In view of this custom of obtaining a revenue from mines by means of mineral leases and the law governing them, it is fair to infer that such disposition of minerals would have been expressly prohibited by the constitution if it had been the intention to forbid it. There was a statute at the time the constitution was framed providing for the organization of mining corporations. R. S. 1851, c. 40, § 1. The court will take judicial notice of the fact that iron ore is found only in a limited portion of the school and swamp lands of the state, and that the existence of such ore on any particular tract of land can only be definitely ascertained by the expenditure of large sums of money in exploration, and in sinking test pits, without any certainty that ore will be found.

This fact emphasizes the difference between standing timber and the proper method of disposing of it, and iron ore and the disposition of it. Standing timber is upon the surface of the earth. It may be accurately scaled, and the quantity and value thereof readily ascertained. A sale of standing timber at public auction, unlike the sale of supposed ore hidden in the interior of the earth, is not a lottery, but a certainty. There is no necessity in the case of standing timber, in order to make a practicable and profitable disposition thereof, to resort to a lease of the land, for the purpose of exploring for timber and removing it, if found, on payment of a stipulated royalty per thousand feet. Such a lease would be absurd, and unknown to the law. Hence, the suggested analogy between the leasing of an unopened mine and the sale of standing timber is not entirely relevant.

It also follows that the state, if it desired to realize from its mineral resources, was under the practical necessity of either undertaking the work of discovering iron ore on its lands and opening mines where ore was found, or securing the doing of such work by individual enterprise, by offering to the successful explorer the exclusive right to a mineral lease of the land on such liberal terms as would be likely to induce parties to assume the pecuniary risks involved in such ventures. The state chose the latter course, and the legislature in accordance with the custom in such cases for centuries, which must have been known to the framers of the constitution, passed the mineral lease statute in question. It has been before this court in the following cases. Whiteman v. Severance, 46 Minn. 495, 49 N. W. 255; Johnson v. Merritt, 50 Minn. 303, 52 N. W. 863; Baker v. Jamison, 54 Minn. 17, 55 N. W. 749; State v. Iverson, 92 Minn. 355, 100 N. W. 91.

In each of the cases the constitutionality of the statute was impliedly assumed, no question to the contrary having been suggested by either court or counsel. If there be any fair doubt as to the constitutionality of this statute, the practical construction given to it by the departments of the state government, including its legal department, and by investors who have parted with their money on the invitation of the state, and in reliance upon the validity of the statute, as found by the trial court, is entitled to great, if not controlling, weight. On the other hand, if it be perfectly clear that the statute contravenes the constitution, then such practical construction must be disregarded. State v. Sutton, 63 Minn. 147, 152, 65 N. W. 262, 30 L. R. A. 630, 56 Am. St. 459; State v. Moffett, 64 Minn. 292, 67 N. W. 68. In the last case cited such practical construction was held controlling; and in the first one that it was not. Now, it is far from clear that the statute in question contravenes the constitution; therefore such practical construction is entitled to serious consideration. The fact that such construction cannot be said to have been contemporaneous with the adoption of the constitution is not specially significant for the occasion, for a mineral lease statute did not arise until a later date.

Upon a full consideration of the question, we hold that this mineral lease statute does not authorize a sale of any of the school or swamp lands of the state, within the meaning of the constitutional prohibition, that it is constitutional, and that the leases in question are valid.

Judgment affirmed.