# STATE v. GALEN L. FINNEGAN.[1]

January 20, 1933.

No. 29,299.

[1]Reported in 246 N. W. 521.

Henry N. Benson, Attorney General, Chester S. Wilson, Assistant Attorney General, and Frank N. Whitney, Special Assistant Attorney General, for the state.

Clapp, Elmquist, Briggs, Gilbert & Macartney, for respondent.

STONE, JUSTICE.

Action by the state to void a sale of swamp land and for cancelation of the certificate of sale. October 26, 1931, the Honorable Stafford King, state auditor, sold to defendant the involved land and issued a certificate pursuant to statutes in force until July 1, 1931, the effective date of L. 1931, p. 206, c. 186, Mason, 1931 Supp. §§ 53-23½ to 53-23½k, creating the department of conservation and transferring the duties of the auditor in respect to state lands to the conservation commissioner. A demurrer to the answer challenging the constitutionality of that statute was overruled, with a certificate of importance and doubt. The state appeals.

The 1931 law is entitled:

"An act relating to the conservation and control of the public domain and natural resources of the state, and to the organization, powers, and duties of the agencies of the state government concerned therewith."

If valid, it inaugurates a new system of state land sale and control. The principal attack is now on § 3, reading thus:

"Except as herein otherwise provided, the commissioner of conservation shall also have all of the powers and perform all of the duties now vested in or imposed upon the state auditor, acting as auditor, as commissioner of the state land office, or in any other capacity, ex officio or otherwise, with respect to the public lands, timber, waters, and minerals of the state."

The claim of invalidity is that by constitutional provisions herein considered the state auditor was given, and retains as against legislative declaration otherwise, the right to sell state swamp lands.

In the beginning there was nothing in the constitution giving the auditor any power over state lands. He is a constitutional officer and a member of the "executive department." Art. 5, §§ 1, 5, and 7. His constitutional function, if any, in relation to state lands was created first as to internal improvement lands by the amendment of 1872, art. 4, § 32(b), which, as far as material, reads as follows:

"All lands donated to the state of Minnesota for the purpose of internal improvement, under * * * the act of congress * * * shall be appraised and sold, in the same manner and by the same officers, and the minimum price shall be the same as is provided by law for the appraisement and sale of the school lands, under the provisions of title one, of chapter thirty-eight, of the General Statutes, except the modifications hereinafter mentioned. [All having to do with the investment of the 'internal improvement land fund' to result from sale of the lands.] * * * The force of this amendment shall be to authorize the sale of the internal improvement lands, without further legislative enactment."

The amendment of 1881, as to swamp lands, reads:

"All swamp lands now held by the state, or that may hereafter accrue to the State, shall be appraised and sold in the same manner and by the same officers, and the minimum price shall be the same less one-third (1/3), as is provided by law for the appraisement and sale of the school lands under the provisions of title one (1) of chapter thirty-eight (38) of the General Statutes. The principal of all funds derived from sales of swamp lands, as aforesaid, shall forever be preserved inviolate and undiminished. One-half (½) of the proceeds of said principal shall be appropriated to the common school fund of the state. The remaining one-half (½) shall be appropriated to the educational and charitable institutions of the state in the relative ratio of cost to support said institutions."

This amendment now appears in art. 8 as the last paragraph of § 2. It omits the concluding sentence of that of 1872, explaining that its force shall be to "authorize the sale * * * without further legislative enactment" of the lands dealt with. But the parallelism otherwise, as to both phraseology and object, of the two amendments is too striking to be ignored. The pattern of the first is followed generally in the second. Literally, both declare that the lands shall be "appraised and sold in the same manner and by the same officers, * * * as is provided by law for the appraisement and sale of the school lands under the provisions of title one (1) of chapter thirty-eight (38) of the General Statutes" of 1866. Literally, as to appraisement and sale and officers selling, the statute is incorporated into each amendment.

Title I of G. S. 1866, c. 38, came into our law first as L. 1862, p. 121, c. 62. It remained, without amendment here material, through the revision of 1866 and the compilation of 1878. It was entitled: "An act to establish the state land office, and for other purposes," and was a new and comprehensive state land code. By § 1 a "state land office" was established to "be and remain at the seat of government." Section 2 made the auditor, ex officio, commissioner of the land office, with (§ 3) "general charge and supervision" of all state lands, and the power to "superintend, lease, sell, and dispose of the same in such manner as shall be directed by law." The law proceeded, through most of its 55 sections, with detailed and mandatory provisions, concerning the manner of appraisal and sale—if true, as we think it is, that terms of payment, rate of interest, and the rights of the purchasers were considered of the manner of sale. For convenience of reference there is subjoined a summary of the provisions of the law other than those the gist of which has just been indicated.*

---

*Section 4 required that records be kept, and § 5 that an annual report be made to the legislature. Section 6 gave the commissioner custody of all maps, books, and papers relating to public lands. Section 7 fixed the minimum price at five dollars per acre, and carried a saving clause, against special acts theretofore passed, of the rights of bona fide occupants of state lands.

■ On the face of the two amendments there is no ambiguity. Were we not compelled to go further, there would be no occasion for interpretation. Ambiguity absent, contracts, statutes, and constitutions are all applied as they read. State ex rel. University of

---

Section 8 fixed the terms of payment with much detail, the maximum time for payment at 20 years, and the rate of interest on deferred instalments at seven per cent. Instalments of the unpaid balance were required to be "payable on the first day of June or within six days thereafter each and every year."

Section 9 prescribed the substance of the certificate of sale to be issued by the auditor upon every sale on time. Section 10 prescribed the provisions of the certificates for forfeiture upon default of the vendee. Section 11 authorized the commissioner to "require of the purchaser such further security for the payment of moneys to become due * * * as in his judgment will secure the respective funds against loss."

Under § 12 patents for lands were to be signed by the governor, upon surrender of the certificate of sale "with the further certificate of the commissioner endorsed thereon, that the whole amount of principal and interest * * * has been paid according to law." Section 13 reserved to the state the fee until patents issued, and went on to declare that certificate holders should be deemed "forcibly and without right" in possession and to be trespassers in case of their noncompliance "with the terms of the certificate as aforesaid." Section 14 authorized the commissioner to enforce by suit the additional security taken by him under § 11. Section 15 authorized the commissioner to subdivide and plat wherever the interests of the state would be promoted.

Dealing with the appraisal, which was prerequisite, § 16 required the appointment of three appraisers, one by the commissioner, and the other two by the county commissioners of each county in which lands were to be sold. The exact form of oath to be taken by the appraisers is prescribed and their compensation fixed at two dollars per day.

Sections 17 and 18 required that all "parcels or lots," the result of subdivision and platting, be subject to sale in the same manner and upon the same terms and conditions as other state lands. Section 19 required the purchase moneys to be paid into the state treasury, and a receipt by the treasurer, countersigned by the auditor.

Section 20 gave to the holder of a certificate, subject to forfeiture for noncompliance with its terms, the right of redemption upon stated conditions. Section 21 provided that unimproved forfeited lands should continue at the minimum or appraised value. Section 22 authorized the commissioner to lease state lands upon stated conditions, and § 23 directed

Minnesota v. Chase, 175 Minn. 259, 272, 273, 220 N. W. 951. But constitutions, like other legal documents, have life and effect only as they apply to extraneous matters. Language which standing alone is plain enough too often becomes a fog of ambiguity when

---

surveys when necessary. Section 24 required prompt report from the commissioner to county auditors of the lands sold in their respective counties.

Section 25 had to do again with subdivisions made by the commissioner. Section 26 required the registers of deeds of the several counties to record the patents issued by the governor. Section 27 made the incidental expenses of the land office a charge upon the state treasury. Section 28 made void sales by mistake, not in accordance with law, or obtained by fraud. Section 29 required that all sales be made for specie or any other legal tender. Section 30 dealt with the rights of assignees of purchasers, and § 31 required that sales be made according to the United States surveys, "unless the same shall have been laid off into smaller lots as provided in this act." Attached is a proviso that "no lands shall be sold in larger quantities than one-quarter section."

Sections 33 to 37, inclusive, deal generally with the subject of trespass on state lands. Section 38 required each county attorney, upon his request, to give to the commissioner his "opinion upon all questions of law which may be submitted to them" by him relating to the duties of his office "without unnecessary delay and without charge to the commissioner or to the state."

Section 39 authorized purchasers to make their payments to the treasurer of the county in which the lands were situated and required of him a suitable receipt, to be countersigned by the auditor of the county. Such receipts were given like effect as those of the state treasurer. Section 40 required an additional bond from the county treasurer before receiving any moneys for state lands. Section 41 required the county treasurer to make a duplicate receipt for all land moneys, one of them to be deposited with the county auditor. Section 42 at some length fixed the attached accounting duties of the county auditor. Sections 43 to 45 also have to do with matters of acounting. Section 46 dealt with the initiation of appraisals by the commissioner, and § 47 with sales at auction, particularly with the notice to be given. It even fixed the maximum price to be paid for the publication of such notices at "ten cents for each description for the whole time of publication." Section 48 dealt with the then existing surveys in the surveyor general's office and adopted them as the basis upon which will be accepted the swamp lands granted to the state by act of congress of March 12, 1860. The subject of § 49 was the squatters on state lands and their removal therefrom, and that of § 50 improvements on state

applied to its subject matter. Even though clear on its face, if the meaning becomes doubtful when related to its subject, resort to construction is not only proper but necessary.

We have such an occasion here, for title I of G. S. 1866, c. 38, had to do mostly with the "manner" of sale and the conduct of the "officers" selling state lands. It is simply impossible to believe— it would bring the amendments in question near to absurdity to hold—that it was the intention to incorporate into the constitution the whole or any considerable portion of the whole statute. Very largely it deals with mere details of administration, plainly improper to be made the subject of constitutional as distinguished from legislative law.

■ Were we to hold that any part or even the general scheme of the statute was incorporated into the constitution, we would have to decide also what parts were so adopted and how much of the general scheme. There would be labored argument to show invalidity rather than validity, unconstitutionality rather than constitutionality. That alone suggests unsoundness in the thesis of invalidity. Statutes are presumptively valid, and the difficulty alone of showing them unconstitutional is a strong argument to the contrary. They are to be held unconstitutional only when no other conclusion is reasonably tenable. That does not mean that oversubtlety may be used to sustain them. But, a fortiori, may it not be used to invalidate them.

We have no more unwelcome task than the review, from the constitutional standpoint, of legislation. The burden is such that courts would gladly relinquish it. However the function is performed, it brings to judges no increase of pleasure, emolument, or

---

lands and their appraisal in case they were sold with the improvements. Section 51 dedicated the proceeds of school lands as "a perpetual school fund in the state." Section 52 deals with the interest on such fund. Section 53 required all moneys received from the sale of any state lands to be paid into the state treasury and that the principal so received be invested in Minnesota or United States bonds. Section 54 repeals inconsistent statutes, and § 55 declared that the law should be in force from and after its passage.

political power, but only criticism, sometimes wholesome and sometimes mere abuse. In the early days of our federal system courts were disliked because they were holding good too many laws, particularly acts of congress. In later years they are disliked for holding some, not many, bad. Its distasteful and onerous character (the importance of it aside) makes all the more necessary studious consideration of the problem whenever presented. We would not hesitate to hold the conservation act invalid could we find compelling reason to do so. Finding none, we sustain it.

Had it been the intention to perpetuate either the state land office or the state auditor as land commissioner, it would have been expressed in direct language, with whatever authorization of legislative action might have seemed wise. Also, had it been the intention to incorporate any particular provision or provisions of the statute as to manner of appraisal and sale, it would have been done with plain words. It seems equally obvious that if the then statutory method was to have been made matter of constitutional law, it would have been so clearly expressed as to admit of no doubt. But if it was purposed only to submit to the people the proposition whether the internal improvement and swamp lands were no longer to be given away but should go on sale at once under existing law (the resulting funds to be conserved as indicated), then it is readily seen how the present language came to be used, even though for that limited purpose a plainer form of expression might have been adopted.

The state land office and commissioner were not confirmed. The omission rather compels the conclusion that there was no intention to confirm, as matter of constitutional law, any function of the auditor as land commissioner. The people would not buttress an existing arch of government and simultaneously discard its keystone without fitting and placing the preferred substitute. Yet the present argument of unconstitutionality asserts they did just that. The internal improvement and swamp lands, it is claimed, must still be sold by the auditor. But the state land office and all its functions otherwise, even those as to appraisal and sale of school lands, may be transferred to other hands chosen by the legislature.

The purpose of title I, c. 38, was to unify and systematize the state land business. The scheme was found good enough so that by the two amendments it was adopted for internal improvement and swamp lands to the extent indicated—whatever it was. It is impossible to conclude that thereby the auditor was made the one and constitutional auctioneer of all state lands (school lands excluded) but that otherwise his powers as manager of state lands were subject to legislative interference. The fact that neither land office nor commissioner was of constitutional origin or character goes far to negative purpose to invest either with constitutional dignity and functions. Neither amendment expresses or even implies any such purpose.

Nor did either amendment touch state school lands. They are not the subject of constitutional safeguard as to manner of appraisal and sale, except that by art. 8, § 2, all were required to be sold at public sale. Otherwise the constitution says not a word as to how or by what officers school lands shall be sold or otherwise handled. Yet they (and later their proceeds) from the state's beginning, have been considered, rightly, as Minnesota's most valuable tangible asset; their dedication to educational purposes the one to be most carefully safeguarded. But the present argument of unconstitutionality implies that they were left unprotected by, while two assets of much lesser value and inferior significance otherwise have been the subject of, a scheme of appraisal and sale incorporated into the constitution itself. The framers originally rejected the proposal to encumber the constitution with a whole code of school land procedure. Minnesota Convention 'Debates (Republican) pp. 167-168, 234, 237, 240, 244, 252, 253; Minnesota Convention Debates (Democratic) pp. 437-438, 464. It would be surprising to find that not long afterward the people put into the constitution an existing statutory code, but made it apply only to internal improvement and swamp lands, leaving its original, and still its vastly more important, subject matter of school lands unprotected by the constitutional change.

■ If the amendments confirmed the functions of the auditor in respect to state land sales, they confirmed as well those of the

governor. It might be arguable also that those of the county auditors and treasurers were likewise confirmed. Certainly the existing system of appraisal, in all its details, was preserved if anything was. The "manner" of sale was dealt with. Thereby the then statutory "manner" was preserved, as a whole, if anything was preserved. It is argued that "manner" of sale means simply sale by public auction—originally required as to school lands by the constitution. Art. 8, § 2. If that was the purpose, a queer and cumbrous way was resorted to for its expression. We think that "manner" of sale means more than the mere mechanics of the auction block—that if anything was preserved, rather than authorized, the whole system of sale was included, the terms of sale and the details of the certificate evidencing it and the rights of the purchaser.

Very important historically is the extension of long term credit on the sale of school lands. In a very real sense, it was of the "manner" of sale, from the standpoint of the new state, eager to sell to actual settlers. In that it had been successful as to school lands. The factor making for that result was the long term credit and easy payments and not the public sales. The latter only safeguarded the state's interest. So, if anything was to be authorized or preserved, the system of long time credit would not have been omitted. It is inconceivable that the auditor would have been continued merely as an auctioneer, with simultaneous authority for the delegation to others of his many equally if not more important duties as land commissioner. "Manner" of sale meant, we think, the whole existing statutory scheme.

The word "manner," unless restricted by context, is comprehensive in its application to such a legal subject as the sale or lease of property. It is not restricted to mere form, but includes also the substance of the whole transaction. The phrase "manner of holding elections for senators and representatives" in art. I, § 4, of the constitution of the United States, was held in Smiley v. Holm, 285 U. S. 355, 366, 52 S. Ct. 397, 399, 76 L. ed. 795, 800, to be "comprehensive words" which, together with the words "times" and "places," embraced "authority to provide a complete code for con-

gressional elections." See also Kentucky Union R. Co. v. Bourbon Co. 85 Ky. 98, 112, 2 S. W. 687; In re Narragansett Election, 16 R. I. 761, 16 A. 907; People v. English, 139 Ill. 622, 29 N. E. 678, 15 L. R. A. 131; Taft v. Adams, 69 Mass. (3 Gray) 126. For additional judicial definitions of "manner" see Wd. & Phr. (1, 2, & 3 ser.).

But the adoption of the existing manner of appraisal and sale was only to authorize the immediate sale of the lands under existing law, and not for the purpose of putting that law beyond the power of the legislature to amend, save as otherwise limited by the constitution. By the very statute referred to (title I, G. S. 1866, c. 38, § 2) the auditor's power to "superintend, lease, sell and dispose of" land was expressly subjected to control by "law."

We hold that the purpose of the swamp land amendment of 1881 (the same conclusion probably must follow as to the internal improvement lands under the amendment of 1872, although that precise question is not before us) was simply to place the swamp lands on sale under existing law, subject to the mandates as to the resulting fund provided by the amendment. That construction gives effect, as it should, to all the amendment. It does place upon the reference to title I, c. 38, a meaning not quite literal. But it does not ignore the reference to the statute. It gives it the effect which, in view of all the circumstances, we consider intended. It avoids consequences so unreasonable, which would otherwise follow, that the restricted scope seems the only one which the people could have intended.

■ If, since 1872 as to internal improvement and 1881 as to swamp lands, the auditor has been the constitutionally exclusive sales agent of the state, it is astonishing that heretofore (with the exception of the unsuccessful effort in State v. Evans, 99 Minn. 220, 108 N. W. 958, 9 Ann. Cas. 520, hereinafter mentioned) the idea has never been suggested by anyone. In numerous instances the legislature has by law dealt with internal improvement and swamp lands in a way wholly inconsistent with any notion that the auditor's functions in respect thereto were protected by the constitution. L. 1885, p. 94, c. 102, § 2, changed the provisions for appraisal and

sale of pine timber land, L. 1877, p. 86, c. 56, changed the terms of payment, and L. 1885, p. 259, c. 195, reduced the rate of interest from seven to five per centum. L. 1885, p. 270, c. 201, authorized extension of time of payment and reduction of the rate of interest on outstanding certificates. L. 1885, p. 331, c. 269, required that pine timber be sold only when a majority of a board composed of the governor, the treasurer, and the land commissioner should certify that the sale was necessary to protect against loss. L. 1895, p. 349, c. 163, changed the method of appraisal, requiring one appraiser to be appointed by the governor, one by the land commissioner, and the other by the commissioners of the county in which the lands were situated. The original law required one to be appointed by the land commissioner and the other two by the county commissioners. Section 9 reduced the time of publication of notice of sale from six to four weeks. Four weeks' posted notice was demanded in case there was no newspaper published in the county. The law also created a state board of timber commissioners composed of the governor, auditor, and treasurer. No timber, although legally part of the real estate, could be sold by the auditor against the veto of this board. L. 1901, p. 97, c. 91, again reduced the rate of interest, this time from five to four per centum.

R. L. 1905, the only revision since that of 1866, abolished the state land office as a separate institution but left its functions with the state auditor. L. 1905, p. 196, c. 162, was entitled: "An act to provide for the appraisal and sale of school and other state lands and fixing the minimum price therefor." It is wholly inconsistent with the notion that there was anything constitutional about the place or duties of the state auditor in respect to state lands. Among other things, it again changed the law as to notice, requiring that notice of all sales be posted on the front door of the court house of the county. By L. 1905, p. 258, c. 204, the composition of the board of timber commissioners was changed, this time to include the governor, the treasurer, the auditor, and attorney general. By the reorganization act of 1925, L. 1925, p. 756, c. 426, art. 2, § 2 (1 Mason, 1927, § 53-3) the powers of the timber commission were transferred to the executive council.

L. 1911, p. 107, c. 90 (G. S. 1923 [1 Mason, 1927] §§ 6434-6439), again changed the terms of sale, requiring the purchaser to comply with stated conditions as to improvement of or residence upon the land, and limited the amount to be sold to any one purchaser to 320 acres. Originally the limit had been 160 acres. Other statutes have been cited in this connection by the attorney general which we do not attempt to review here. There has never been executive objection to any such laws.

The foregoing shows, we think, that there has never been legislative or executive thought that the auditor, as land commissioner or otherwise, was entrenched in the constitution in respect to any function in relation to state lands. The only expression of judicial view is equally negative—expressly so. In State v. Evans, 99 Minn. 220, 108 N. W. 958, 959, 9 Ann. Cas. 520, a mineral lease issued by the auditor as land commissioner was under attack. The attorney general invoked the swamp land amendment and argued not only that the lease was a sale of the minerals, and therefore of part of the land, but also that title I of G. S. 1866, c. 38, "with all its limitations, so far as it provides methods of sale became a part of the constitution as applied to swamp lands. * * * The portions of the chapter relating to sales was adopted by the constitutional amendment." (State's brief, p. 20.) So it was not obiter when the court said [99 Minn. 223], in holding against the state, that "from a reading of the whole section, as amended" (in 1881) the purpose "was to place swamp lands as to a sale thereof on the same basis as school lands, and not to incorporate in the constitution, by the use of general language, statutory provisions as to the details for the sale of school lands."

Aside from the unsuccessful attempt in the Evans case, 99 Minn. 220, 108 N. W. 958, 9 Ann. Cas. 520, it never has been suggested by anyone on behalf of any department of the state government that the auditor has the constitutional function now claimed for him. That decision is at least a judicial negative of any such view.

Significant is the view of the swamp land amendment taken by the late Doctor William Watts Folwell. He refers to it (3 Fol-

well, History of Minnesota, p. 119) as "one of importance, * * * providing for the sale of swamp lands." Although he discusses at length the experience of Minnesota with its public lands of all kinds, with detail characteristic of the quality of his scholarship, no suggestion is anywhere made that the amendment was a constitutional grant of power to the auditor, as land commissioner or otherwise. A footnote explains that the amendment "was ratified on November 8, 1881, by a vote of 51,903 to 8,440. In 1860 congress donated to Minnesota all the [swamp] land * * * on condition that the proceeds of sales should be devoted to the drainage of the lands so far as might be necessary. As there were millions of acres of dry land ready for clearing and cultivation, the early legislatures saw no necessity for draining swamps. There was no difficulty of getting rid of the burden of the gift. Beginning with a donation of 694,400 acres to the Lake Superior and Mississippi Railroad Company in 1861, in the course of twenty years nearly two million acres were granted to railroad companies. The people at length became weary of the importunity of railroad companies and began to understand that some swamp lands when drained became the best land for some purposes. They therefore cheerfully ratified the constitutional amendment of 1881." Thereby they adopted the "different policy" referred to in Scofield v. Scheaffer, 104 Minn. 123, 126, 116 N. W. 210; different in that it protected the lands from donation to railroads or anyone else by requiring their sale in the same manner as school lands.

The constitutional provisions invoked being at best of doubtful meaning, in application thereto, our duty is to sustain the law which it is said they invalidate. That aside, the unbroken practical construction just dealt with and extending now as to swamp lands over an even half century, and as to internal improvement lands for nine years more, is of importance and persuasive. But upon the grounds examined in subdivision two hereof, it might be difficult to hold otherwise as an original matter.

It follows that the order appealed from must be and is reversed.

HILTON and OLSEN, JUSTICES, took no part in the consideration and decision of this case.