STATE EX REL. HENRY HANSEN v. E. A. WALSH.[1]

March 17, 1933.

No. 28,988.

*George G. Edgerton* and *Edgerton, Dohs & Edgerton*, for relator.

There was a return to the writ and a motion to quash filed on behalf of respondent by *Henry N. Benson*, former Attorney General, and *Chester S. Wilson*, former Assistant Attorney General.

Upon hearing of the case there was an appearance and argument on behalf of respondent by *Harry H. Peterson*, Attorney General, and *William S. Ervin*, Assistant Attorney General.

STONE, JUSTICE.

Certiorari to the adjutant general to review his denial of relator's claim for relief under the Spanish war veterans relief act, L. 1931, p. 552, c. 405.

Relator's claim is based upon § 1, reading thus:

"That the word 'soldier' as used in this act, shall mean any officer, soldier, sailor, marine or nurse who was a part of the military or naval forces of the United States during the Spanish American War, Philippine Insurrection, and China Relief Expedition, and who was a bona fide resident of the State of Minnesota, at the

[1] Reported in 247 N. W. 523.

time such soldier was commissioned, enlisted, appointed, mustered into, or as a nurse contracted into the military or naval service of the United States, and who rendered service subsequent to April 11, 1898, and prior to the official termination of hostilities of the Philippine Insurrection, July 4, 1902, and who was given an honorable or ordinary discharge or release from such service; * * * the provisions of this act shall not apply to any individual who was commissioned or served as an officer in the Regular Army prior to July 4, 1902."

The Spanish American war was brought to an end by the president's proclamation of April 11, 1899. The Philippine Insurrection continued until July 4, 1902. The China Relief Expedition was considered by the army as continuing from June 20, 1900, to May 27, 1901. These dates are important because relator, a native and then a resident of Minnesota, enlisted in the regular naval service July 12, 1901, and continued therein until February 25, 1906; that is, while not in service during the Spanish American war, he was during the Philippine Insurrection for a period of 11 months.

Relator insists that inasmuch as he was "a part of the military or naval forces of the United States during" the time of the Philippine Insurrection he is entitled to the benefit of the law, although none of his service had to do with either the Philippine Insurrection or the China Relief Expedition, except that he might have been ordered to service in the area of hostilities. Until the end of the Philippine Insurrection he seems to have been in Atlantic or European waters.

Pressed to the utmost is the argument that the literal meaning of the statute cannot be departed from under the guise of construction, and that "during" must be taken in its ordinary meaning as synonymous with "in the time of." If so, inquiry ends at once in relator's favor, because there is no question that some of his naval service was rendered while the Philippine Insurrection was going on. The argument would be unanswerable, perhaps, were we not required to look beyond the mere words and examine their operation. Again we must stress the fundamental that a statute, like

other writings, cannot be considered independently of its subject matter. State v. Finnegan, 188 Minn. 54, 246 N. W. 521. It is of interest and effect only when applied operatively to the things which it is intended to regulate and possibly to reorder. There must be resort to construction if, when the words are applied to their subject matter, ambiguity develops. If when we attempt to work a statute uncertainty arises, there is as much and the same need for settling the meaning as though the question arose on the face of the writing.

The framers of such laws have in mind the broad and basic distinction between an international conflict, officially declared and proclaimed as war, and a mere local insurrection or punitive expedition.

It has been said that if war "be declared in form, it is called solemn, and is of the perfect (sic) kind, because one whole nation is at war with another whole nation, and all the members of the nation declaring war are authorized to commit hostilities against all the members of the other, in every place and under every circumstance. In such a war all the members act under a general authority, and all the rights and consequences of war attach to their condition." 27 R. C. L. 915.

So a "solemn" war is as far from a local insurrection or punitive expedition in its legal as in its factual attributes and effects.

The policy of awarding pensions or other similar benefits to all soldiers serving anywhere during a declared war has been so long established as to become the general rule. So, when there is a blanket award to all who have served "during" such a conflict, there cannot be much doubt that the meaning was to include all who were actually in the military service during the determinative period, even though in many cases the individuals benefited may not have seen service in any hostile area.

It has never been national policy to award pensions indiscriminately to soldiers or sailors simply because they happen to have been such while a relatively small portion of our armed forces were engaged in quelling a local disturbance, such as an Indian

uprising, or in an expedition such as that after Villa in Mexico. Much less has it been a policy of the states or any of them to grant a service bounty to any soldier or sailor simply because, while a resident of the donor state, he happened to serve in the regular army or navy while some local conflict was going on far from the scene of his service. So, if relator's construction of the law is correct, it is a sudden reversal of traditional policy without explanation in historical happening or contemporaneous thought. Legislatures may make such reversals of policy, but seldom do so spontaneously or without well advertised cause or occasion. Nothing of that kind announced or explained the departure from traditional policy which relator claims was made by the Spanish war veterans act.

Section 1 is poorly drawn. At the very outset, a literal meaning cannot be put upon "during the Spanish American War, Philippine Insurrection, and China Relief Expedition." Literally, that phrase requires service in all three to entitle any soldier, sailor, or nurse to the benefit of the law. The conjunctive "and" must, through construction, be replaced by disjunctive "or" to avoid an absurd result, one obviously not intended although literally expressed. The language presents another difficulty in that the period of the China Relief Expedition lies wholly within that of the Philippine Insurrection. So, if service anywhere during any of that period is enough to satisfy the law, then it was inexcusable surplusage even to mention the China Relief Expedition.

The operation of the law upon the three classes of service, service during a declared war, service during an expedition into China, and service during an equidistant local insurrection, makes it doubtful at least whether "during" any more commands literal interpretation than the neighboring "and" already supplanted in construction by "or." "During" may mean one thing in relation to a solemnly declared war and something else in application to a subject so different as a transpacific insurrection or punitive expedition. In the former case the word may signify "in the time of" without any reference to locality. In the latter the meaning may

be "in the course of" with factors of both time and place. Such control of context and subject over the connotations of a word is a common phenomenon of our difficult language.

The ordinary service man, who was a regular during all the period now determinative but without service in any hostile area, would describe his service as having taken place in or during the Spanish American war, but as having had nothing to do with either the China Relief Expedition or the Philippine Insurrection. He would consider his service during the Spanish American war as war service, although not of a combat variety. But he would be the last to include himself in any category of service in connection with, or "during," the troubles in China or the Philippines. The effect of declared war is all-pervasive as to the areas and all-inclusive as to the subjects of the belligerents. So, in a legal sense, all are involved, and all soldiers and sailors serve in such a war. Mere punitive expeditions or local rebellions have no such pervasive and inclusive effects. Hence, as a matter of common understanding, no one serves in or during such an expedition or insurrection unless he is actually in it; that is, serving within the area of hostilities, or at least that of the military operation in question.

■ The foregoing is not an attempt to say precisely what was intended by § 1. But the subject has been explored far enough to cast doubt upon the argument that all Minnesotans who served after the Spanish American war in the regular army or navy, at points far distant and in a manner wholly disconnected with the Philippine Insurrection or the China Relief Expedition, are entitled to relief. It is significant that the board established under the law was designated the "Spanish War Veterans Board," and the money raised was to go into and be disbursed from the "Spanish War Veterans Fund." § 4. Consideration of the whole statute, in relation to its subject matter and against the background of state policy and experience, leaves the matter in doubt. The doubt is of such real and substantial character that without going farther it requires a decision against relator under the rule that public grants "are construed strictly in favor of the government on grounds of

public policy." 2 Lewis' Sutherland, Statutory Construction (2 ed.) § 548; 6 Dunnell, Minn. Dig. (2 ed.) § 8990. The application of that rule to a pension law is just as logical as it is to the grant of a franchise, although the latter field is the conventional one for its application.

Nothing further need be said to show that a decision against relator is required. Such a decision gains assurance by the concurrence of the adjutant general, who was explicitly charged with the administration of the law. § 7. His is the initial duty to examine into and allow or disallow applications. It is impossible to surmise that he did not have a more or less active part in formulation of the statute. Although it is not to be supposed that he participated in the matter either as a supporter or opponent of the law, he surely was consulted as to its coverage and the resulting need of money. The matter was distinctly within his jurisdiction on the executive side. Therefore his opinion as to the intended coverage of the law is entitled to great weight. His denial of relator's application will be affirmed.

So ordered.